**Max GRENADER et al.,**
**Plaintiffs-Appellants-Appellees,**

v.

**Milton SPITZ et al.,**
**Defendants-Appellees-Appellants,**

**Bernard Cooper et al., Defendants.**

**Nos. 601, 661, Dockets 75–7592, 75–7601.**

United States Court of Appeals,
Second Circuit.

Argued March 15, 1976.
Decided April 28, 1976.

---

**2.** We are, of course, only at the pleading stage and we may not consider whether the appellants can prove their allegations.

Charles Marks, New York City, for plaintiffs-appellants-appellees.

Dennis J. Block, Kevin P. Hughes, Weil, Gotshal & Manges, New York City, for defendants-appellees-appellants.

Before MULLIGAN, GURFEIN, Circuit Judges, and NEAHER,* District Judge.

MULLIGAN, Circuit Judge:

We are presented here with the question whether the sale of the stock in a privately owned and operated New York City apartment house cooperative constitutes the sale of a "security" within the Securities Act of 1933 (15 U.S.C. § 77a et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.). We answer the question in the negative primarily on the authority of *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).

This action was commenced in the United States District Court for the Southern District of New York by the tenants of seventeen apartments in an apartment building located at 345 East 57th Street in the City of New York (the Building) which has been converted into a cooperative housing corporation according to the General Business Law of the State of New York (§ 352-e et seq.). The defendants, Milton Spitz, Henry Spitz and Jerome Spitz, former owners of the Building, are sued individually and as a partnership doing business as Three Forty Five Management Co., the sponsor of the cooperative conversion plan and managers of the Building. The defendant 34557 Tenants Corporation (the Corporation) is a New York corporation organized by the sponsor to consummate the conversion by issuing its stock to tenants in return for money to be used to purchase the Building. The other named defendants are tenants who supported the conversion plan and purchased stock pursuant to it.

The complaint which was filed on September 6, 1972, contained four causes of action. The first alleged violations of sections 5 and 17 of the Securities Act of 1933 (15 U.S.C. §§ 77e and 77q), section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j(b)) and rule 10b–5 on the

---

* Edward R. Neaher, United States District Judge for the Eastern District of New York, sitting by designation.

ground that the shares sold were never registered with the Securities and Exchange Commission and that the prospectus through which they were offered contained misleading statements or omissions of material facts. The second cause of action claimed the commission of a prima facie tort by the defendants in seeking acceptance of the conversion plan. The third cause of action alleged that there was a failure to comply with the filing requirements of sections 352–e(1)(a) and (b) of the New York General Business Law. The fourth cause of action pleaded that the defendants had failed to obtain the subscription by 51% of the tenants before the May 16, 1972 deadline provided in the prospectus. Plaintiffs sought damages of $14,600 on the first cause of action and $500,000 on the second, as well as declaratory relief on the third and fourth causes. The defendants alleged affirmative defenses to the first cause of action, claiming that there was no subject matter jurisdiction, that the cooperative plan was exempt from registration under section 3(a)(11) of the 1933 Act (15 U.S.C. § 77c(11)) (the intrastate exemption), and that therefore the court also had no jurisdiction of the pendent state claims. The defendants further claimed that the actions were barred by a prior pending action in the New York State Supreme Court based on the same facts.

By notice of motion dated November 17, 1972, plaintiffs moved for summary judgment on the first, third and fourth causes of action and to strike the affirmative defenses. In a memorandum decision and order of March 3, 1975 (reported at 390 F.Supp. 1112), District Court Judge Charles E. Stewart, Jr., in reliance upon this court's decision in *1050 Tenants Corp. v. Jakobson*, 503 F.2d 1375 (2d Cir. 1974), found that subject matter jurisdiction was properly predicated upon the federal securities laws. He further held that the issue was exempt from registration under the intrastate exemption of the 1933 Act. He denied the motion for summary judgment, finding genuine issues of material fact in both the federal and state causes of action. The Supreme Court decided *United Housing Foundation, Inc. v. Forman, supra,* on June 16, 1975 and the defendants, on June 25, 1975, moved orally for dismissal of the complaint for lack of subject matter jurisdiction in light of the *Forman* holding.

In a memorandum decision and order of September 26, 1975, Judge Stewart reaffirmed his prior holding that no registration was necessary by reason of the intrastate exemption. He further held that the shares of stock of the defendant Corporation were distinguishable from those considered by the Court in *Forman* and were securities and investment contracts within the federal securities laws. The court then certified two questions for appellate review in accordance with 28 U.S.C. § 1292(b):

"(1) Whether the intrastate exemption under § 3(a)(11) of the Securities Act of 1933 is available in the case at bar, and (2) whether the securities here come within the purview of the federal securities laws  .  .  ."

On October 25, 1975, this court granted leave to appeal on these two questions. Concluding that our decision in *1050 Tenants Corporation v. Jakobson* is no longer viable by reason of the holding in *Forman*, we hold that the shares here involved are neither securities nor investment contracts within the federal securities laws. The question of exemption is therefore rendered moot. We reverse the order below on the second question certified and direct the dismissal of the complaint, including the pendent claims in the second, third and fourth causes of action.

## FACTS

The focal point of this controversy is a residential apartment house constructed in 1929 and containing sixty dwelling units. Forty-two apartments were rent-controlled and eighteen apartments were rent-stabilized. There are no commercial units on the premises.

In December 1942, the Building was acquired by Milton Spitz, Edward Spitz, Henry Spitz and Jerome Spitz, as trustees for their mother, Minnie Spitz, and by Jerome

Spitz individually. At or about the time of this acquisition, the family formed a partnership which did business under the firm name Three Forty Five Management Company. Thereafter, the Building was managed and operated by the partnership.

An unsuccessful attempt at converting the Building to a cooperative was made in 1969. In view of the magnitude of tenant opposition at that time, the plan was withdrawn and abandoned. Two years later, on June 3, 1971, the Spitz brothers entered into an agreement among themselves to sponsor and promote the instant plan of conversion. They proposed to form a corporation which would issue its shares to the tenants, and use the proceeds to purchase the Building from the sponsoring partnership. In accordance with this agreement, the Spitz brothers caused the 34557 Corporation (sued herein as "34557 Tenants Corp.") to be formed under the New York Business Corporation Law. This corporation has an authorized capital of 7,000 shares of stock with a par value of $1.00 per share. The trust which had been administered by the partnership terminated with the death of Minnie Spitz on August 18, 1971. On September 17, 1971, the offering plan was filed by the sponsor with the Attorney General of the State of New York as required by section 352–e of the General Business Law. It was submitted to the tenants of the Building on the same date.

The content of the plan was principally devoted to the real estate interests being conveyed. The purchaser had to enter into a subscription agreement for the number of shares allocated to the unit in which he was interested, and was thereby entitled to a proprietary lease for his apartment. The apartments would be sold for residential use and the maintenance fees received from the respective owners would constitute the cooperative's income. These receipts would be slightly augmented by rental income of $180 per month from a laundry concession maintained in the basement for the tenants' convenience, and by a 5% commission on gross receipts from tenants who subscribed to Manhattan Cable Television. The pro-spectus set forth the tenants' respective statutory rights, and included a copy of the subscription agreement, proposed proprietary lease and by-laws of the Corporation.

The shares of stock received by tenants are not freely transferable. The stock cannot be transferred except in connection with the purchase and delivery by the cooperative of a proprietary lease for the apartment to which the shares were allocated. Prior approval of such a transfer was required by either a resolution of the directors of the Corporation, by written authorization of a majority of the directors, or by written consent or affirmative vote of lessees owning 65% of the then-issued shares. A restrictive legend to this effect was printed on the share certificates.

The actual ownership of the individual apartments was governed by the proprietary lease, the execution of which was a condition precedent to tenancy. This document fixed the arrangement for contributions by apartment owners to the cash needs of the Building for its common expenses, and set forth restrictions and requirements for the subletting or transferring of ownership rights. Upon failure to contribute to common expenses, bankruptcy, improper transfer of the shares, improper assignment or subletting, or breach of any other provision of the lease, the Corporation can give notice of expiration of the tenancy and the owner was required to surrender his apartment.

Under the offering plan in its original form, the cooperative was to acquire the Building from the sponsor for $2,140,000; $840,000 was to be realized from the sale of stock, and the balance of $1,300,000 was in the form of mortgage indebtedness. A reserve fund for repairs of $97,500 was to be retained by the cooperative from the purchase price, reducing the sponsor's net proceeds to $2,042,500. As a result of negotiations among the sponsor, the tenants, and the Attorney General, a series of amendments was proposed which reduced the purchase price, increased the cooperative's reserve fund, increased the required percentage of subscribing tenants and extended

the plan's expiration date. The conversion was declared effective by an amendment dated June 6, 1972, and the sponsor delivered the deed to the cooperative on November 29, 1972. On December 11, 1972, the shareholders elected directors and officers to serve until the next annual meeting.

## THE LAW

There is no doubt that the shares of stock involved here would be deemed securities within the federal securities acts [1] under the holding of this court in *1050 Tenants Corp. v. Jakobson,* 503 F.2d 1375 (2d Cir. 1974). However, Judge Timbers' opinion there was premised upon the so-called "literal" approach adopted by Judge Oakes in his opinion in *Forman v. Community Services, Inc.,* 500 F.2d 1246 (2d Cir. 1974) which was reversed by the Supreme Court in *United Housing Foundation, Inc. v. Forman, supra.* The "literal" approach as defined by Judge Oakes was simply "the fact that 'stock' certificates are used in a 'stock' corporation is sufficient in itself to bring transactions in the 'stock' within the literal definition of the Acts." 500 F.2d at 1252.

This "literal" approach was explicitly rejected, however, by the Supreme Court in its reversal of the holding in *Forman.* Mr. Justice Powell in his opinion for the Court stated:

> We reject at the outset any suggestion that the present transaction, evidenced by the sale of shares called "stock," must be considered a security transaction simply because the statutory definition of a security includes the words "any . . . stock." Rather we adhere to the basic

principle that has guided all of the Court's decisions in this area:

> "[I]n searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight,* 389 U.S. 332, 336 [88 S.Ct. 548, 553, 19 L.Ed.2d 564] (1967).

421 U.S. at 848, 95 S.Ct. at 2058, 44 L.Ed.2d at 630.

Looking at the realities, the Court noted that "[c]ommon sense suggests that people who intend to acquire only a residential apartment in a state-subsidized cooperative, for their personal use, are not likely to believe that in reality they are purchasing investment securities simply because the transaction is evidenced by something called a share of stock." Id. at 851, 95 S.Ct. at 2060, 44 L.Ed.2d at 631.

The Court in *Forman* was considering shares of stock in "Co-op City," a New York City public housing cooperative which was publicly subsidized under the Mitchell-Lama Act, New York Private Housing Finance Law §§ 10–37. The housing here was privately sponsored and owned and the question at issue is whether this fact sufficiently distinguishes the case from *Forman* so that *Jakobson,* which also involved a private cooperative, remains viable. We hold that the shares here are not securities under the federal acts and that *Forman* effectively overruled *Jakobson.*

*Jakobson* was, as we have pointed out, explicitly bottomed on the literal approach of our holding in *Forman* which is now discredited. See *1050 Tenants Corp. v. Jakobson, supra,* 503 F.2d at 1378. The Su-

---

1. Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), provides:

   (1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "se-

   curity", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

   This definition is virtually identical to that contained in section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), and the two will be considered together for purposes of this discussion. *Tcherepnin v. Knight,* 389 U.S. 332, 342, 88 S.Ct. 548, 556, 19 L.Ed.2d 564, 572 (1967).

preme Court's opinion in *Forman* stressed "economic reality" and emphasized that the tenants there were seeking residential housing for their personal use and were not purchasing investment securities simply because the transaction was evidenced by shares of stock. We think the same reality exists here. The tenants were seeking a place to live and whether their residence be in a publicly or privately financed cooperative residence has no legal significance in our view. While the initial offering was made to those who already occupied apartments in the Building and who were rent-controlled or rent-stabilized, this is a requirement of New York law. (Rent and Eviction Regulations of the Housing and Development Administration § 55, and Code of the Real Estate Industry Stabilization Association of New York City, Inc. § 61, both following N.Y.Unconsol.Laws § 8617). Once the Building became a cooperative they were no longer protected by these provisions and could be evicted, so that their obvious motive in purchasing shares was to retain their residence. A reading of the offering plan, the proprietary lease and subscription agreement make it crystal clear that the purchase of stock was completely tied to the lease of the apartment. The shares cannot be transferred to a non-tenant; a terminating tenant is required to relinquish his stock and the purchaser must execute a proprietary lease and be acceptable as a tenant to the board of directors of the cooperative.

The Court in *Forman* also pointed out that the most common feature of stock is "the right to receive 'dividends contingent upon an apportionment of profits.'" 421 U.S. at 851, 95 S.Ct. at 2060, 44 L.Ed.2d at 631, quoting *Tcherepnin v. Knight, supra,* 389 U.S. at 339, 88 S.Ct. at 554, 19 L.Ed.2d at 570. There is no affirmative provision for the payment of dividends in the transaction before us. Article III, § 10 of the by-laws provides:

Distributions: The shareholders-tenants shall not be entitled, either conditionally or unconditionally, except upon a complete or partial liquidation of the Corporation, to receive any distribution not out of earnings and profits of the Corporation.

The appellees argue that this clause implies that distribution *may* be made out of earnings and profits. Under the economic reality test of *Forman,* it is indeed impossible to envisage what cash dividends would be reasonably anticipated from the operation of a cooperative residential housing venture. The only substantial income of the Corporation arises from the payment of rent or maintenance charges by the tenants, estimated on the basis of the cash requirements needed to operate the Building on an annual basis plus the creation of reserves for contingencies. Unlike *Forman,* there are no commercial tenants in the Building. Aside from rental income are the fees realized from the coin-operated laundry and cable television which, of course, are tenant-financed and not significant. There is not a scintilla of evidence that any tenant was induced to become a purchaser of shares because he might expect to realize dividends. Whatever profit might be realized could only result in a reduction of the maintenance charged. Realistically, in view of continuously escalating labor, fuel and maintenance costs, all that a tenant could reasonably expect would be escalating monthly charges. The argument that a share purchaser was induced to acquire his apartment because of an opportunity to realize cash dividends is altogether frivolous.

As we have already indicated, the shares here were not negotiable absent a sale of the apartment; they could not be pledged or hypothecated unless as security for a loan to purchase the tenancy. In sum, none of the characteristics of ordinary shares of stock are present here. In fact, the continuing obligation to pay a monthly rental fee to maintain the tenancy of the lessee strongly supports the conclusion that this was basically a real estate transaction and not an investment in a security.

In *Forman,* the voting rights of the shareholder were on the basis of one vote for each apartment irrespective of the number of shares owned. The Court in *Forman*

pointed out that in contrast, in the usual corporate venture the shareholder's vote does depend upon the number of shares held, 421 U.S. at 851, 95 S.Ct. at 2060, 44 L.Ed.2d at 632. Appellees urge that here the shareholder's voting power depends upon the number of shares owned and that *Forman* is thus distinguished. The argument is without merit. The number of shares that a tenant can purchase is fixed by the offering plan and is clearly in proportion to the size and location of the apartment leased. Thus the lessee of a first floor, five room apartment is obligated to purchase 100 shares while the lessee of a sixteenth floor, six room apartment is required to purchase 159 shares. Thus if anything, the relationship of share purchase here to actual apartment residency is even more direct than in Co-op City, where the apartments were fungible as far as voting rights were concerned.

Appellees' major argument in distinguishing *Forman* is that the lessee in Co-op City whose tenancy is terminated, voluntarily or otherwise, is required to offer his stock to the housing corporation at its initial selling price. Since he is the beneficiary of a public subsidy, the requirement that he make no profit is understandable. In contrast, the tenant of the private cooperative Building here admittedly has the right to dispose of his apartment and his shares to a new and approved lessee-purchaser at whatever price the real estate market then permits. Hence, there is an opportunity to make a profit and it is urged that this is a normal characteristic of a security or, more accurately, an investment contract within the securities acts. Moreover, the court in *Jakobson, supra*, 503 F.2d at 1378, so held. Again, we hold that the opinion of Mr. Justice Powell in *Forman* is definitive.

As we have already indicated, the transaction here essentially involves the acquisition of a residence. Just as the purchaser of a private one family residence is not unaware that he may eventually sell his property at a profit or loss depending upon the vagaries of the real estate market, so

the proprietary lessee of a privately owned cooperative cannot be unconscious of the fact that upon its disposal he will gain or lose depending upon the same market factors.

More pointedly, the *Forman* Court (421 U.S. at 852–53, 95 S.Ct. at 2060–61, 44 L.Ed.2d at 632–33) adopted the definition of an investment contract set forth in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). That opinion defines the term as follows:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party   .   .   .

Id. at 298–99, 66 S.Ct. at 1103, 90 L.Ed. at 1249.

We note initially that the *Howey* test first requires that the investor be "led to expect profits." There is nothing in the record before us to support the contention that the investor here was attracted by the prospect of realizing a profit on his investment. While the court below found that the tenants were attracted by the dual motives of obtaining housing and realizing a profit on their investments, the documentary evidence, which is all that was before the court, would indicate that the profit motive, if any, was purely incidental. The offering plan, which includes the subscription agreement, the proprietary lease and the by-laws is barren of any representation or intimation of anticipated profits. Unlike the hawking siren song of the promoter, the plan here is a prosaic recitation of the financial facts underlying the transaction with an exhaustive recitation of the physical properties and condition of the Building and the apartments offered as well as the terms of the tenancy and the obligations of the lessee. There is no reference to the possibility or probability of profits. In fact, there is ample warning that the annual maintenance charges set forth for each apartment (together with the purchase price of the shares fixed for each unit) are

only estimates. An enclosed letter provides: "It may be expected, based on current trends, that such items as real estate taxes, fuel costs, maintenance repairs, labor and other related expenses will change in the future." Appellees, apparently aware of the failure of proof of inducement, include in an addendum to their brief exhibits outside the record indicating that tenant meetings were held to discuss the offering plan. What inducements, if any, were there made are consequently not before us.

There is a further flaw in appellees' argument. *Howey* requires that the profits arise "solely from the efforts of the promoter or a third party." 328 U.S. at 299, 66 S.Ct. at 1103, 90 L.Ed. at 1249. While efficient management of the cooperative will enhance its desirability as a place of residence, it is hardly a factor which would result in the appreciation in value of the shares of a Corporation operating a Building nearly fifty years old. Realistically, that will depend upon the general housing market, the status of the neighborhood and the availability of credit. See Berman and Stone, Federal Securities Law and the Sale of Condominiums, Homes and Homesites, 30 Bus.Law. 411, 422–24 (1975).

The distinction between the investment contract and the transaction under scrutiny here becomes apparent when we examine the cases relied upon in *Forman*. Thus in *Howey*, a Florida corporation owning large citrus acreage offered small parcels of orchard land to investors along with a service contract. The purchasers' tracts were then jointly cultivated, the company sold the produce and investors received a portion of the profits based on the acreage they owned. This was held not to be a purchase of real estate but rather an investment for profit. "The resulting transfer of rights in land is purely incidental." Id. at 300, 66 S.Ct. at 1103, 90 L.Ed. at 1250.

Similarly, in *SEC v. C. M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), lessees of large tracts sold leases of the property representing that test oil wells would be drilled. The promotional literature touted the well and the potential return to the investor. The Court found the transactions were investment contracts and securities within the 1933 Act.

As the Court in *Forman* noted, "when a purchaser is motivated by a desire to use or consume the item purchased—'to occupy the land or to develop it themselves,' as the *Howey* Court put it, [328 U.S. at 300, 66 S.Ct. at 1103, 90 L.Ed. at 1250]—the securities laws do not apply." 421 U.S. at 852–53, 95 S.Ct. at 2060–2061, 44 L.Ed.2d at 632.

We reiterate that viewing the economic realities, the purchasers here desired to personally occupy the apartments and were not led to expect bonanza profits analogous to the oil wells or citrus orchards discussed above. We therefore conclude that *Jakobson's* holding that the private cooperative shareholder tenancy is an investment contract under the federal securities acts cannot survive the *Forman* analysis.

While profits may also result from a participation in earnings resulting from the use of investors' funds, *Tcherepnin v. Knight, supra,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564, no serious argument can be made that funds invested here were ever intended to be devoted to anything but the purchase of the Building and its maintenance. Whatever excess might exist would normally be expected to be placed in interest bearing accounts or secure investments but this is hardly within the statutes.[2]

While the holding here deprives the investors of whatever protection the federal securities laws provide, this is, as we have

---

**2.** In *Tcherepnin,* an Illinois Savings and Loan Association sold withdrawable capital shares, the holder becoming a member of the Association. The shares had no fixed rate of return, and dividends were based on the profits of the Association. In finding this arrangement to be an investment contract, the Court held: "Petitioners are participants in a common enterprise—a money-lending operation dependent for its success upon the skill and efforts of the management of City Savings in making sound loans." Id. at 338, 88 S.Ct. at 554, 19 L.Ed.2d at 570. The case is therefore distinguishable.

discussed, by virtue of authoritative and persuasive construction of those acts by the Supreme Court. Moreover, real estate transactions are traditionally left to state supervision. The transaction here involved is regulated by the Martin Act in New York and litigation is now pending in the courts of that state involving the very issues raised here.[3]

The order appealed from is reversed and the complaint dismissed.

---

3. The Martin Act in New York State (N.Y. General Business Law § 352–e) requires the filing of the offering plan. Appellees commenced an action in the state court, charging omissions and deficiencies in the plan and nam-ing the Attorney General as a defendant. That litigation, commenced in 1972, is still on appeal to the New York Court of Appeals. In July 1975, the appellees commenced another action in the state courts alleging common law fraud.