Wendy TIMMRECK et al., Plaintiffs,

v.

Patrick MUNN et al., Defendants.

No. 76 C 2045.

United States District Court,
N. D. Illinois, E. D.

Jan. 7, 1977.

Thomas P. Young, Wotan, Muscarello & Crisanti, Elgin, Ill., for plaintiffs.

Robert H. Wheeler and Donald J. McLachlan, Isham, Lincoln & Beale, Chicago, Ill., for defendant 15 and American Standard, Inc.

Robert J. Oliver, Thomas E. Laughlin, Connolly, Oliver, Goddard, Coplan & Close, Rockford, Ill., for defendants 1, 2, 3, 7, 9, 10, 13, 14, Whetstone, W. L. Belvedere, Lorenz, Jr. and Taylor.

Kurt L. Schultz, Winston & Strawn, Chicago, Ill., for defendant Independence Mortgage Trust.

Patrick W. O'Brien, Alan R. Borlack, Mayer, Brown & Platt, Chicago, Ill., for defendant Continental Ill. Nat. Bank.

Leon J. Garrie, Los Angeles, Cal., for defendants 1, 2, 3, 7, 8, 10, 13, 14 and Whetstone.

## MEMORANDUM OPINION

DECKER, District Judge.

### I. Background of the Case

The 328 plaintiffs in this case allege that they have been defrauded in their purchases of lots in Candlewick Lake Subdivision during the years 1971 through 1973. They assert that they were led to believe by means of the defendants' advertising, financial statements, statement of record filed pursuant to the Interstate Land Sales Act, and other representations, that their undeveloped lots would be substantially improved and would greatly appreciate in value. They charge that these promises have not been kept and that the developers were undercapitalized and in fact lacked the funds to fulfill their obligations to complete the Candlewick Lake development.

The plaintiffs have brought a sixteen-count consolidated complaint against 23 defendants. These defendants include the Continental Illinois National Bank and Trust Company of Chicago ("Continental Bank"), which is alleged to have financed the project by purchasing the plaintiff's promissory notes secured by their mortgages.

The other defendants include developers, officials of the developers and other entities associated with the planning and financing of the Candlewick Lake project. Two defendants have been dismissed without prejudice by the plaintiffs, and one has filed an answer to the complaint. Three defendants are currently in corporate reorganization, and three individual defendants have not been located for service of process.

The Continental Bank has filed a motion to dismiss, and a separate motion to dismiss has been joined in by the remaining thirteen defendants.

Count I of the complaint asserts that the real estate purchase contracts made by the plaintiffs were investment contracts, and thus securities within the meaning of federal securities law, the 1933 Securities Act, the 1934 Securities Exchange Act and Rule 10b-5. The plaintiffs allege that the defendants' representations induced them to make their "investments" and constituted a fraud covered by the securities laws.

Count II, which alleges that the defendants offered and sold securities without filing a registration statement as required by the 1933 Act, is conceded by the plaintiffs to be barred by the statute of limitations.

Count III is brought under the Interstate Land Sales Act, 15 U.S.C. § 1701 *et seq.*, and alleges various misrepresentations and omitted essential statements in the statement of record filed by the developer with HUD, and in the representations made to the plaintiffs.

The remaining thirteen counts are pendent jurisdiction state statutory and common law claims.

## II. Is the Sale of Securities Alleged in Count I?

As noted *supra*, Count I alleges fraud relating to the sales of securities, and charges violations of § 17(a) of the 1933 Act (15 U.S.C. § 77q), § 10(b) of the 1934 Act (15 U.S.C. § 78j) and of Rule 10b-5. The plaintiffs maintain that their real estate purchase contracts were investment contracts and note that the definition of "security" found in § 2(1) of the 1933 Act (15 U.S.C. § 77b) expressly includes "investment contracts". The defendants deny that this transaction is covered by securities law, and characterize it as a mere real estate transaction.

Interpretation of the securities laws is governed by two conflicting judicial concerns. Since the Acts were devised to protect the public from speculative or fraudulent schemes advanced by promoters, they must be construed liberally as remedial statutes. *S. E. C. v. Glenn W. Turner Ent., Inc.*, 474 F.2d 476 (9th Cir. 1973).

The Supreme Court has held that the term "investment contract"

"embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *S. E. C. v. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).

The Court had earlier stressed that "[n]ovel, uncommon, or irregular devices, whatever they may appear to be, are also reached [under this definition]". *S. E. C. v. Joiner Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943). In essence, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Most recently the Court in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 851, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), again emphasized that trial courts must look to the "substance" of the transaction.

But while the securities laws must be utilized with flexibility to remedy the prot-

ean forms of investment fraud, the court is also mindful that these laws cannot be utilized as catch-all solution for business fraud and other economic torts. Previously this court has commented that "the word 'security' is not a judicial philosopher's stone for the conjuration of federal cases." *Lincoln National Bank v. Lampe,* 414 F.Supp. 1270, 1280 (N.D.Ill.1976).

■ Thus, the court must carefully match the allegations of the instant complaint against the well-established standard for investment contracts first articulated by the Supreme Court in *Howey, supra,* and recently reiterated in *Forman, supra,* 421 U.S. at 852, 95 S.Ct. 2051.

"The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value." *Howey, supra,* 328 U.S. at 301, 66 S.Ct. at 1104.

The plaintiffs in this case assert that the lots they purchased were vacant and substantially undeveloped. They maintain that the lots were not worth the purchase price without the substantial improvements which the defendants are said to have promised. These improvements and amenities are listed in detail in paragraph 36 of the complaint. The complaint maintains that these representations were made in maps, brochures and other written and oral representations.

The plaintiffs, therefore, argue that the excess purchase price over the current value represented a common fund which would be used by the defendants to make improvements which would substantially increase the value of the individual lots. This is said to constitute a common enterprise dependent upon the efforts of the defendants, and thus fall within the definition of an investment contract.

The defendants respond by contending that the plaintiffs have all acknowledged that no such representations of future improvements influenced their agreement to purchase their lots. This is based on the inclusion in the standard real estate contracts signed by the defendants of certain language in paragraph 11 that "[b]uyer acknowledges that no representations or warranties oral or written, have been made by Seller which are not set forth in this Contract."

Defendants then rely upon the decision of Judge McMillen in *Bubula, et al. v. The Grand Bahama Development Co., Ltd.,* No. 73 C 3131 (N.D.Ill. 6/27/74), for the proposition that "[a]lleged oral misrepresentation cannot transform a document into a security to bring it within the jurisdiction of this court if the document itself does not satisfy the definition of the statute and the case law."

In *Bubula* it seems that the plaintiffs asserted that the real estate purchases were securities upon the basis of a clause providing for a small "service" charge for maintenance and other minor improvements, and other oral and written representations "about the nature and value of the land". The court apparently viewed the former as insufficient to establish a common enterprise with profits solely from the efforts of the defendants. And while Judge McMillen did give some emphasis to the fact that the latter representations were specifically excluded from the purchase agreement, it is clear that mere generalizations about the "nature and value" of the property could not suffice to transform a routine real estate transaction into an investment.

■ To the extent that some of the language in *Bubula* intimates that a contractual clause disclaiming prior representations bars the court from considering such promises in assessing the deal as a securities transaction, this court must dissent.

In *S. E. C. v. Joiner Corp., supra,* the Supreme Court stated that

"the test [for an investment contract] is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." 320 U.S. at 352–53, 64 S.Ct. at 124.

The Court did not limit the analysis to the four corners of the final contract completing the transaction. Rather the "terms of the offer", the "plan" and the "economic inducements" must all be considered. As noted above, securities analysis requires inquiry into the substance of the transaction, and emphasis upon economic reality rather than mere form.

Just as the Court will not permit language denominating an interest as "stock" to automatically invoke the securities laws *Forman, supra,* 421 U.S. at 848, 95 S.Ct. 2051, boilerplate disclaiming inducements to purchase land as an investment should not deter the court from considering all the evidence bearing upon the true nature of the purchase. As will be noted *infra,* the courts have repeatedly scrutinized promotional literature before determining whether an "investment contract" was truly at issue.

Paragraph 11 is part of a preprinted standard contract form for the Candlewick development. Possibly such a clause might be enforceable under contract law despite its clear nature as an adhesion clause. But this language must be disregarded for securities law analysis. This is particularly true where the boilerplate is likely to prove palpably false.

In this case the complaint alleges that defendants' maps, brochures and other writings made very specific material representations as to the improvements planned for the Candlewick development. The plaintiffs seek to be allowed to introduce these materials as well as evidence of alleged oral representations, to sustain their claim that these lots were sold as investments.

An adhesion integration clause cannot eradicate the reality of any such representations, and bar them from securities law consideration. Whatever its effect under contract law, it is not an incantation to change the past. A common thread among the opinions analyzing these statutes is the admonition that the courts must be prepared to meet the flexible and ever-changing tactics of fraudulent promoters. This can be done only by viewing the full context of the transaction.

The language in paragraph 11 of the contracts, upon which defendants base their argument that the court need only consider the representations included in the sales agreement, is common to most land transactions.

The defendants, therefore, are mistaken when they argue that paragraph 11 distinguishes this case from those actions where the courts considered extra-contractual representations.

In particular, they are in error in implying that the plaintiffs in *McCown v. Heidler,* 527 F.2d 204 (10th Cir. 1975), were in a different position than purchasers who "had acknowledged that no representations had been made other than those contained in their contracts". In fact, the agreement for deed in *McCown* contains language in paragraph 6 that is strikingly similar to paragraph 11 of the contract before this court: "There is no understanding or agreement between the parties except as expressly set forth or made a part hereof, and this Agreement may not be amended except in writing." [1]

Despite the existence of an integration clause virtually identical to paragraph 11, the Tenth Circuit found that a factual question had been raised as to whether the sale of lots constituted a sale of securities. The case was remanded to the trial court for further consideration of the evidence offered by the plaintiffs.

---

1. The instant defendants argue that the *McCown* opinion does not indicate that any integration clause was part of the agreement. The court has gone beyond the language of the opinion and has obtained a copy of the contract in question. Apparently either the *McCown* defendants or the Tenth Circuit had so little

■ In analyzing the pleadings and exhibits presently before the court,[2] the court of course recognizes that

"land as such is not a security and that a land purchase contract, simply because the purchaser expects or hopes that the value of the land purchased will increase, does not fall automatically within the confines of the Securities Acts." *McCown v. Heidler, supra,* 527 F.2d at 208.

*See Forman, supra.*

But in a variety of circumstances the courts have found that real estate deals were in fact investment contracts. *S. E. C. v. Howey, supra; S. E. C. v. Joiner Corp., supra; McCown v. Heidler, supra.*

■ As noted, there is an investment aspect in every land transaction arising from the hope of increased property values.[3] But, as the Supreme Court recently stressed, there is frequently also a strong motivation to purchase real estate for purposes of "consumption", that is to occupy the land or develop it by one's own effort. *Forman,* 421 U.S. at 853, 95 S.Ct. 2051.

The court must therefore consider the nature of the promotion to determine whether the emphasis of the developers and their sales agents was on the "investment" or the "consumption" side of the real estate duality.

For example, in *Forman* the Supreme Court contrasted those attracted solely by the prospects of a return on investment from those attracted solely by the prospect of acquiring a place to live. It was clear that Coop-City, the property in question, attracted its owners on the latter basis.

It is apparent that the same considerations justified the court's dismissal of the complaint in *Davis v. Rio Rancho Estates, Inc.,* 401 F.Supp. 1045 (S.D.N.Y.1975), a case cited by the defendants. Judge Brieant noted that the defendants promoted their project by brochures which "fairly read, place more emphasis on development of a residential community than on purchase as an investment." 401 F.Supp. at 1049.

The defendants seek to portray *Rio Rancho* as following their construction of *Bubula, supra.* But Judge McMillen's opinion was not cited for the reasons stressed by the defendants. Indeed, although the case was nominally disposed of on a motion to dismiss, it is clear from the passage quoted above that Judge Brieant went beyond the language of the contracts to scrutinize the defendants' promotional literature. Only after the inquiry into these materials could the court reach any determination as to the nature of the offering.

Using a similar analysis the Tenth Circuit found a factual question as to the existence

---

regard for the import of this clause that it was not even mentioned in the opinion.

2. In addition to the complaint and the briefs submitted by the parties, the defendants have introduced six exhibits. Exhibit A is an affidavit and list of the plaintiffs, identifying the lots purchased and the date of purchase. Exhibit B *is a list of plaintiffs who purchased their lots* prior to June 3, 1973, that is more than three years before the commencement of this action. Exhibit C is an affidavit and copies of the standard contracts utilized for these transactions. Exhibit D is a copy of the unpublished opinion of Judge McMillen in *Bubula, et al. v. The Grand Bahama Development Co., Ltd.,* No. 73 C 3131 (N.D.Ill. 6/27/74). Exhibit E includes an affidavit and a list of the dates on which various units of the development were first sold. Exhibit F is an affidavit and a copy of the August 25, 1972, agreement between Continental Bank and Candlewick Lake Associates.

3. Although Judge Carter gave some emphasis in *Happy Investment Group v. Lakeworld Prop., Inc.,* 396 F.Supp. 175, 180 (N.D.Cal. 1975), to the fact that "unlike other investment contract cases . . . plaintiffs will not realize any actual profits on their investment until their lots are sold", this is not enough to bar a contract from qualifying as a security. Two months after the *Happy Investment* decision, the Supreme Court stated that the profits which must be expected for a transaction to qualify as an investment contract may be "either *capital appreciation resulting from the development of the initial investment* . .. . or a participation in earnings resulting from the use of investors' funds." *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975) (emphasis added).

of a possible investment contract sufficient to compel a remand of *McCown, supra,* to the district court. The court of appeals analyzed the brochures which laid extremely heavy stress on the investment nature of the recreational property in question.

It is thus also apparent that the court cannot determine the relative emphasis given to the profit-seeking and the "consumption" sides of this project without an analysis of the representations and promises made by the defendants.

For example, the defendants rely upon *Happy Investment Group v. Lakeworld Prop., Inc.,* 396 F.Supp. 175 (N.D.Cal.1975). But in that case, too, the court *did* find it necessary to consider the defendants' "literature and sales talks", before determining the existence of a securities law claim. 396 F.Supp. at 180.

Similarly, in *Grenader v. Spitz,* 537 F.2d 612 (2d Cir. 1976), also cited by the defendants, the court studied the offering plan which included materials other than the proprietary lease, including letters sent to prospects. The Second Circuit also pointed out that the Supreme Court considered such materials in *Joiner, supra,* and expressly based its decision upon profit seeking—consumption dichotomy established by *Forman.*

Several of the opinions relied upon by the defendants cite 1 Loss, *Securities Regulation,* pp. 491–92 (2d ed. 1961):

"[N]o 'investment contract' is involved when a person invests in real estate, with the hope perhaps of earning a profit as the result of a general increase in values concurrent with the development of the neighborhood, *as long as he does not do so as part of an enterprise whereby it is expressly or impliedly understood that the property will be developed or operated by others.*" (Emphasis added.)

Following this analysis of Professor Loss, it is clear that this court must allow the plaintiffs to present evidence as to any understandings expressed or implied by the defendants that Candlewick would be extensively developed and improved by them and thereby increase the value of the plaintiffs' property.[4]

Furthermore, the complaint alleges that the purchase price would not be appropriate for undeveloped lots absent the substantial improvements which the plaintiffs assert were promised by the defendants. Such a disproportion in price is another indicium of the possible existence of an "investment contract". It may indicate that the plaintiffs were induced by "faith or hope in the success of the enterprise . . . as a whole, and not the value of the [lots] alone." *Continental Marketing Corp. v. S. E. C.,* 387 F.2d 466 (10th Cir. 1967).

While *Continental Marketing* dealt with a beaver breeding scheme, the Tenth Circuit has applied its reasoning to recreational land developments, holding that where the price paid was inconsistent with the value of the undeveloped lots "[t]he utilization of purchase money accumulated from lot sales to build the promised improvements brings

---

**4.** Of course not every promise or even minor improvement suffices to create an investment property. Minimal managerial services are not enough. *Bubula, supra; Rio Rancho, supra.* Nor will the mere inclusion of roads supplied by the developer transmute a run-of-the-mill real estate sale. *Rio Rancho.* A court must distinguish between mere puffery, generalizations, and other talk designed to create an "illusion" of extensive development plans, from cases where the real burden of development is not placed upon the purchasers. *Happy Investment, supra.*

In the instant case, some of the alleged representations fall into the category of salestalk and puffery, e. g., "real estate is the source of all wealth", "it is inconvenient to be alive physically but dead financially", and "there would

be beautiful wooded and waterfront investment sites".

However, ¶ 36 is replete with specific alleged representations that cannot be dismissed as generalizations or illusions. E. g., 37 miles of snowmobile trails, four sand beaches, no lot would be less than ¼ acre in size, there would be a fence around the perimeter, there would be an 80′ × 40′ Olympic size swimming pool. Promises to provide such items, using common funds, and thereby to increase the value of the individual lots would tend to establish an investment. Other factors, such as any emphasis given to Candlewick as a desirable place for the purchasers to spend *their* time, of course, may counterbalance such representations.

the scheme within the 'common enterprise' definition." *McCown v. Heidler, supra,* 527 F.2d at 211.[5]

■ The court therefore concludes that it cannot determine that the plaintiffs have not pleaded a claim cognizable under the securities laws from the materials presently before the court. As noted in *Tober v. Charnita, Inc.* 58 F.R.D. 74, 86 (M.D.Pa. 1973), an action raising a similar claim,

> "the issues to be decided are factual and would require a great deal of discovery and perhaps an evidentiary hearing before the record would be sufficient to support a finding of fact [on any motion the defendants might bring to dismiss or grant summary judgment]."[6]

With the possible exception of *Bubula, supra,* in all the cases cited by either side the courts considered the representations, whether oral or written, made by the defendants before determining the nature of the transaction. Since Count I raises a genuine issue of material fact, it cannot be dismissed upon the record presently before the court.

### III. The Statute of Limitations for Count I

■ Since there is no express statute of limitations for the federal securities laws, the parties agree that the controlling statute of limitations is § 13(D) of the Illinois Securities Act, Ill.Rev.Stat. ch. 121½ § 137.-13 D. *Parrent v. Midwest Rug Mills, Inc.,* 455 F.2d 123 (7th Cir. 1972).

The Illinois statute of limitations provides for a three-year period, which would bar those plaintiffs who purchased their lots prior to June 3, 1973.

However, the plaintiffs assert, and the defendants assent to the proposition that the statute of limitations is subject to equitable tolling where fraud was either affirmatively concealed, or could not be discovered despite due diligence. *Tomera v. Galt,* 511 F.2d 504 (7th Cir. 1975); *Hochfelder v. Midwest Stock Exchange,* 503 F.2d 364 (7th Cir. 1974).

The plaintiffs assert that there has been concealment of the fraud, and note that in any case the failure of the defendants to perform according to their representations could not have been discovered until well after 1973. It is self-evident that fraudulent promises to build certain amenities in the future cannot be detected at the time of the representations.

The plaintiffs concede that the complaint currently does not contain allegations sufficient to assert the equitable tolling doctrine. Under the present circumstances,

---

**5.** The Tenth Circuit noted that this type of claim would not be barred by the literal language of the Supreme Court's standard in *S. E. C. v. Howey Co., supra,* that the investor must rely "solely upon the efforts of the promoters." The Ninth Circuit had previously ruled in *S. E. C. v. Glenn W. Turner Ent., Inc.,* 474 F.2d 476 (9th Cir. 1973), that "the word 'solely' should not be read as a strict limitation on the definition of an investment contract." Instead, the Ninth Circuit chose to adopt the more realistic test of looking to see "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." 474 F.2d at 482. Except in *Happy Investment Group, supra,* none of the cases cited by the defendants seem to have been decided upon the "solely" test. And in that case the court found that the defendants had made no real commitments, and felt that the real hope for appreciation lay in the plaintiffs' efforts at developing their own lots.

The Supreme Court acknowledged the existence of the *Glenn Turner* doctrine in *Forman, supra,* 421 U.S. at 852, fn. 16, 95 S.Ct. 2051, but did not express any viewpoint either for or against this construction.

**6.** The defendants stress that *Tober v. Charnita, Inc.,* was actually a ruling on the question of class certification and did not consider a motion to dismiss. That is correct, but it is also true that the dictum cited *does* indicate that there must be a factual hearing prior to any ruling on such a motion. It is irrelevant that the trial judge also expressed some doubt as to the validity of the particular securities law claims at issue in that case.

*McCown v. Heidler, supra,* does cite *Tober.* However, it cannot be said that the failure of the Tenth Circuit to recite that *Tober* was a ruling on a class certification motion in any way undermines the holding expressed in *McCown.* In any event, it is certain that *McCown* was in no manner exclusively dependent upon the language found in *Tober.*

therefore, there would be justification to dismiss Count I with respect to those plaintiffs who purchased their lots prior to June 3, 1973.

However, dismissal would likely prove superfluous since the plaintiffs have indicated their willingness to amend their complaint. If such an amendment contains allegations asserting either active concealment, or the impossibility of discovery of the fraud despite due diligence, and alleges the dates at which the plaintiffs became aware of the purported fraud, there would be no need to dismiss this aspect of the complaint.

Accordingly, the plaintiffs are hereby granted thirty days in which to file an amendment to the instant complaint alleging the basis for any equitable tolling of the statute of limitations.

### IV. Count II

The parties are in agreement that Count II is barred by the applicable statute of limitations. Therefore, the defendants' motion to dismiss Count II is hereby granted, and Count II is ordered dismissed.

### V. The Liability of Continental Bank under Count III

As noted, Count III alleges various misrepresentations and omissions of essential fact, both in representations made to the plaintiffs, and in the statement of record filed with HUD. This action is brought under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et seq.* The Continental Bank asserts that it is not a party liable under this statute.

Two paragraphs in Count III contain the language with which the plaintiffs seek to assert their claim against the Bank. Paragraph 24 states that the Bank "financed the project and, in such financing, entered into an accord with Candlewick Lake Associates [the developers] and allowed themselves to be held out to the general public . . . as the financial backers of the project."

In paragraph 39 the plaintiffs charge that "[a]ll other Defendants named herein participated with or aided and abetted Candlewick Lake Associates in the preparation and filing of the statement of record and the sale of lots pursuant thereto."

The gist of the Bank's motion to dismiss is that 15 U.S.C. § 1709 limits private actions to those brought against developers and their agents. These terms are defined in § 1701.

A developer is

"any person who directly, or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision." § 1701(4).

An agent is

"any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision; . . ." § 1701(5).

Continental Bank views Count III as being solely based upon its purchase of the plaintiffs' notes secured by mortgages, and argues that this type of financing is expressly exempted by the statute. The Bank relies upon 15 U.S.C. § 1702(a)(5) which bars the application of the Land Sales Act to "the sale of evidences of indebtedness secured by a mortgage or deed of trust on real estate."

The plaintiffs emphasize that paragraph 39 of Count III asserts that Continental Bank went beyond mere financing of the project and actively "aided and abetted" the developers. The complaint, of course, also asserts that the Bank held itself out as a financial backer of the project.

The plaintiffs rely upon *McCown v. Heidler, supra,* for their expansive view of the scope of the Land Sales Act. That opinion viewed the Act as designed to "prohibit and punish fraud", and concluded that the Act should be construed flexibly to effectuate its remedial purposes. The Tenth Circuit saw the thrust of the Act to be directed against "fraudulent planners and profit makers". It upheld the right to bring a claim for relief against the officers and directors of the developer, holding that a cause of action can be stated against individuals, "be they officers, directors or participating planners".

The Bank asserts that the reference to "participating planners" is merely dictum or "unfortunately broad language". This is not entirely certain when the case is read in the context of the discussion of the flexible anti-fraud remedial purposes of the Act. The *McCown* opinion was concerned with the possibility that the actual developers might become bankrupt and leave the victims of a fraud without a remedy. The Tenth Circuit feared that the Act might otherwise become "pragmatically barren" and therefore turned its attention to the "actual fraudulent planners and profit makers".

Continental Bank has submitted an Exhibit F containing an affidavit from its Vice President Paul J. Pfeilsticker, to the effect that the sole significant agreement between the Bank and Candlewick Lake Associates was the August 25, 1972, agreement to purchase the secured notes of purchasers of the Candlewick lots who met the credit qualifications of the Bank. The exhibit also contains a copy of that agreement.

These documents do not fully clarify the extent to which the Bank participated in the planning of the project and the preparation of the statement of record, or in the sales efforts of the other defendants. Nor do they completely resolve the dispute as to the extent to which the Bank held itself out as the financial backer of the project.

It is apparent that the Bank had an interest in the success of the Candlewick project and in the sale of the lots to qualified buyers since it would thereby make profitable loans secured by the real estate.

Furthermore, the August 25th agreement does contain language which might assure prospective buyers that the Bank had confidence in the project, and was persuaded that the promised improvements would in fact be completed and that the development was reliably financed.

On pages 4 and 5 of the agreement § 5(b) implies that the Bank would not accept any obligation to purchase notes unless the developer

"has continued and is continuing to complete all improvements of the Candlewick Lake Subdivision, including (without limitation) the dam, lake, association, club and utilities, within the periods set forth in Exhibit 3 hereto, and it appears that there are sufficient funds available to complete the improvements." [7]

The defendant Bank is correct in stating that the Act exempts lending institutions acting in the normal course of their business. *Bettis v. Lakeland, Inc.,* 402 F.Supp. 1300 (E.D.Tenn.1975); *Zachery v. Treasure Lake of Georgia, Inc.,* 374 F.Supp. 251 (N.D.Ga.1974); *Adema v. Great Northern Development Co.,* 374 F.Supp. 318 (N.D. Ga.1973). But these cases also reveal that the courts will make inquiries into the extent of the financing institution's participation in the project.

The plaintiffs are therefore entitled to attempt to show that the Bank exceeded the normal scope of financing practices and actively participated in and aided the advancement of a fraudulent scheme, or otherwise assisted in the luring of purchasers for an allegedly dubious project.

Furthermore, this court has previously ruled that a bank enjoying a statutory exemption may nonetheless be liable as an aider and abettor of another party's viola-

---

7. Some of the promised improvements which the plaintiffs have alleged to be false representations made by the defendants are included among the items mentioned in § 5(b) or in Exhibit 3. For example, the complaint alleges that there is no 200 acre spring-fed lake, nor a 80′ × 40′ Olympic size swimming pool, nor four sand beaches, although these items were promised. Indeed, Exhibit 3 indicates that the Bank expected the swimming pool to be completed *prior* to December, 1972, well before many of the plaintiffs made their purchases. Furthermore, while § 5(b) indicates that the Bank had demanded assurances that there would be "sufficient funds" to complete the improvements, the complaint alleges that Candlewick Lake Associates was undercapitalized to fulfill the development obligations. The complaint charges that this situation was also falsely omitted from the statement of record filed by the developers with HUD.

tions of the law. In *Tucker v. Janota*, No. 75 C 2931 (N.D.Ill. 10/18/76), the court reconsidered a previous opinion and reinstated against certain defendant banks as aider-abettors of violations of the broker dealer provisions of the Securities Exchange Act.

The court reasoned that an exclusion from a statutory definition (whether it be of brokers and dealers, or developers and agents) should not allow a bank to profitably conspire with impunity with others in violation of the law.

 It should not make any difference that the plaintiffs are proceeding in Count III under the Land Sales Act rather than the Securities Exchange Act. This law, too, is a flexible antifraud statute, and must be given broad scope. *McCown, supra.* If the plaintiffs can assemble sufficient evidence to establish that the Continental Bank aided and abetted the alleged fraud of the developers, the Bank may be held liable under the Act.

At present, therefore, there is insufficient evidence before the court to justify a motion to dismiss the Continental Bank from the claims asserted in Count III.

## VI. Statute of Limitations for Count III

The statute of limitations provision for the Interstate Land Sales Full Disclosure Act is found at 15 U.S.C. § 1711.[8]

The statute requires that actions to enforce liability for material falsehoods or omissions in the statement of record or the property report (violations of §§ 1709(a) or (b)(2)) must be brought within one year of the violation or the point at which it should

have been discovered by the exercise of reasonable diligence. The limitation period for suits brought under § 1709(b)(1) (violations of § 1703[9]) is two years after the violation.

The defendants rely greatly upon the final sentence of § 1711 which provides that "[i]n no event shall any such action be brought by a purchaser more than three years after the sale or lease to such purchaser." They contend that this constitutes an absolute bar against any claims under the Act by the numerous plaintiffs who purchased their lots in the Candlewick development prior to June 3, 1973. They also contend that the two-year limitation absolutely bars the § 1703 based claims of all the plaintiffs except Julia Mischanko, who purchased her lot on August 8, 1974.[10] They then note that the complaint does not allege when any of the plaintiffs, and in particular the post-June 3, 1973, purchasers, were subjected to the alleged false representations, or when they discovered the alleged falsity.

The defendants' interpretation of the effect of the statute of limitations may be summed up as follows: the only possible surviving claims are those brought by post-June 3, 1973, purchasers based upon false representations, and the § 1703 claim of Ms. Mischanko. However, they maintain that the complaint lacks the allegations necessary to indicate that these claims have been brought within the statutory period.

The plaintiffs concede that the complaint currently lacks the allegations needed to place the Count III claims within the stat-

---

**8.** 15 U.S.C. § 1711 provides as follows:

"No action shall be maintained to enforce any liability created under section 1709(a) or (b)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 1709(b)(1) of this title, unless brought within two years after the violation upon which it is based. In no event shall any such action be brought by a purchaser more than three years after the sale or lease to such purchaser."

**9.** Section 1703 includes a provision barring fraudulent schemes and the obtaining of money by means of material misrepresentations.

**10.** The defendants argue that Ms. Mischanko has also failed to allege the date of the violation against her. As a consequence they assert that her complaint should also be dismissed. In the alternative, they feel she should be at least compelled to amend her complaint to allege satisfaction of the statute of limitations.

ute of limitations. However, they state that they are prepared to offer an amendment making the necessary allegations.

These are only housekeeping issues. The critical question is whether this statute of limitations can be equitably tolled. The plaintiffs argue that land sale fraud is subject to the same principles as securities fraud, and that the tolling doctrines of *Tomera v. Galt, Hochfelder* and *Parrent,* all cited *supra* in Section III, are applicable to Count III.

■ The defendants counter that those cases were all based upon the Illinois Securities Act statute of limitations,[11] and that equitable tolling will not apply where the federal statute contains an express limitations period. They thus view the two-year and three-year limitations period in § 1711 as absolute, and not subject to tolling where it is alleged that the violations were fraudulently concealed.

Very few cases have actually construed § 1711. The defendants therefore rely on cases construing 15 U.S.C. § 77m, a similarly worded statute of limitations found in the 1933 Securities Act.[12] They maintain that this is proper since the public record indicates that Congress viewed the Interstate Land Sales Act as a statute parallel to the 1933 Act. *U. S. v. Del Rio Springs Inc.,* 392 F.Supp. 226, 228 (D.Ariz.1975).

Following this logic, the defendants note that in *Cowsar v. Regional Recreations, Inc.,* 65 F.R.D. 394, 397 (M.D.La.1974), the court held that

"under the clear and unambiguous terms of Sec. 13 of the Act [15 U.S.C. § 77m], the plaintiffs' suit, as it pertains to the allegations contained in Count I has prescribed and may not be pursued. The

fact that the plaintiffs contend that they did not discover the untrue statements and/or omissions until February of 1973 is immaterial. The statute is clear and unambiguous. . . . [N]o case could be found which holds that the allegations of fraudulent concealment, even if properly made, will toll the running of the three year period of limitation contained in Sec. 77m. The three year period is absolute and it runs from the date of the last sale."

There is semantic logic to the defendants' position. Where the statute expressly provides for a tolling period for fraudulent concealment, and then includes a secondary date which "in no event" can be surmounted, there is good basis for the belief that the latter date was intended as an absolute barrier to the filing of suits. *See Maher v. J. R. Williston & Beane, Inc.,* 280 F.Supp. 133, 137 (S.D.N.Y.1967). If the statute may be tolled without limitation, it is hard to view the final sentence of § 1711 as anything but surplusage.

This was the conclusion of Judge Smith in *Hester v. Hidden Valley Lakes, Inc.,* 404 F.Supp. 580 (N.D.Miss.1975), a case cited by neither party. That opinion construed the "umbrella" three-year limitation period and concluded that

"[t]he language of Section 1711 is clear. Congress obviously intended to place an absolute limit on the length of time within which aggrieved parties must sue to enforce their rights under the act." 404 F.Supp. at 582.

The only recorded case which implies that the "umbrella" period can be tolled is *Happy Investment Group v. Lakeworld Proper-*

---

11. Ill.Rev.Stat. ch. 121½ § 137.13 D provides:
 "No action shall be brought for relief under this Section or upon or because of any of the matters for which relief is granted by this Section after 3 years from the date of sale."

12. 15 U.S.C. § 77m provides:
 "No action shall be maintained to enforce any liability created under section 77k or 77l(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have

been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77l(1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77l(1) of this title more than three years after the security was bona fide offered to the public, or under section 77l(2) of this title more than three years after the sale."

*ties, Inc.,* 396 F.Supp. 175 (N.D.Cal.1975). The opinion indicates that there was some dispute as to whether the three-year or the two-year period was applicable. Without any express resolution of this question, or any analysis of the tollability of the three-year period, it appears that those plaintiffs who had purchased more than three years prior to the filing of the case were *not* dismissed.

*Happy Investment* does not provide persuasive arguments against the logical interpretation of the language of § 1711 found in *Hester,* one which accords with the construction given the parallel securities law limitations formula. Certainly Congress had the power to place limits upon a federal remedy for land development fraud created by its own statute.

The court therefore finds that Count III must be dismissed with respect to those plaintiffs who purchased their lots prior to June 3, 1973.

On the other hand, the few reported cases which construe § 1711 make it clear that the two-year limitations period *can* be tolled.

In *Hall v. Bryce's Mountain Resort, Inc.,* 379 F.Supp. 165 (W.D.Va.1974), the plaintiffs alleged a violation of § 1703(b), claiming that the defendants had not given them a copy of the property report. The court held that defendants' mere silence, unaccompanied by any fraudulent acts or representations, would not toll the two-year statute of limitations. However, the court indicated that it did have the equitable power to toll the statute in an appropriate case. "To suspend the statute of limitations in this case, there would of necessity have to have been some positive, affirmative action on the part of the defendant, designed to conceal the existence of liability and to operate in some way upon the plaintiffs to prevent or delay the bringing of the suit." 379 F.Supp. at 169–70. *See, Melhorn v. AMREP Corp.,* 373 F.Supp. 1378 (M.D.Pa.1974), where the court also held that § 1711 could be tolled, but found that the proper circumstances were lacking in the case at bar.

More persuasive still is the opinion of Chief Judge Carter in *Happy Investment Group v. Lakeworld Properties, Inc.,* 396 F.Supp. 175 (N.D.Cal.1975). In that case most of the plaintiffs had purchased their lots more than two years prior to the filing of the case. As in the instant case, there were also plaintiffs who had bought more than three years prior to the suit.

Judge Carter held that the statute could be tolled by "a showing that defendants concealed from plaintiffs the basic facts forming a cause of action, and that plaintiffs were in ignorance of the facts through no fault of their own." The plaintiffs made such allegations, and the court held that Land Sales Act counts could not be dismissed since "there is preliminarily a question of fact as to whether plaintiffs were lulled or deceived to a degree which might toll the statute." 396 F.Supp. at 188.

Thus, all three reported cases which construe § 1711 concur that the two-year statute of limitations for violations of § 1703 *can* be tolled.

In the instant case the plaintiffs assert in their briefs that the defendants have actively concealed the alleged fraud, and have offered to amend their complaint to include sufficient allegations to invoke the doctrine of equitable tolling. Accordingly, the plaintiffs are hereby granted thirty days in which to file an amendment to the instant complaint alleging the basis for any equitable tolling of the two-year statute of limitations.

## VII. The Pendent Counts

Since the court has ruled that Count I does state a claim for relief under federal law, and has determined to permit the plaintiffs to amend their complaint to allege the satisfaction of the statute of limitations applicable to Count I, there is no basis at this time to dismiss Counts IV–XVI for want of pendent jurisdiction.

## VIII. Summary

The motions to dismiss Count II filed by the fourteen moving defendants are hereby

granted, and Count II is ordered dismissed with respect to them. The claims under Count III of all plaintiffs who purchased their lots in Candlewick Lake prior to June 3, 1973, are also ordered dismissed with respect to the instant movants. The plaintiffs are hereby granted thirty days in which to amend their complaint to allege the satisfaction of the statutes of limitations applicable to Count I and Count III.

In the event that no such amendment is filed within thirty days, the court will dismiss Counts I and III and any pendent counts unsupported by federal claims, where appropriate, in accordance with the conclusions of law contained in this opinion.