Leslie W. McCOWN et al.,
Plaintiffs-Appellants,

v.

James W. HEIDLER et al.,
Defendants-Appellees.

Leslie W. McCOWN et al.,
Plaintiffs-Appellees,

v.

Joseph C. CALDWELL et al.,
Defendants-Cross-Appellants.

Nos. 74-1755, 74-1756.

United States Court of Appeals
Tenth Circuit.

Dec. 22, 1975.

Frederic Dorwart, Tulsa, Okl., for appellants.

James C. Lang, Tulsa, Okl., for appellee-cross-appellant, Joseph C. Caldwell.

Hawley C. Kerr and Paul P. McBride, Tulsa, Okl., for other appellees and cross-appellants (Fred S. Nelson, Brian S. Gaskill, Irvine E. Ungerman, Robert S. Rizley and William D. Hunt, Tulsa, Okl., on the briefs for appellees-cross-appellants).

Before Mr. Justice CLARK,* LEWIS, Chief Judge, and HILL, Circuit Judge.

LEWIS, Chief Judge.

The plaintiffs, purporting to represent a class of land purchasers, brought suit against the defendants alleging common-law fraud and violations of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et seq.* The defendants were officers and members of the board of directors of Timberlake, Inc. or Heidler Corporation, the parent corporation.

The plaintiffs purchased lots in Timberlake, a large real estate development promoted by Heidler Corporation and Timberlake, Inc. The developers were obligated to include a large lake, 18-hole golf course, swimming pools, clubhouse, roads, etc. Subsequent to the sales to plaintiffs, both Timberlake, Inc. and Heidler Corporation were adjudicated bankrupt by the district court and receivers were appointed.

The plaintiffs alleged that the two corporations and individual defendants knowingly misrepresented their corporate capacity to complete the development obligations, which misrepresentations operated as a fraud and deceit on lot purchasers in violation of the Interstate Land Sales Full Disclosure Act (Land Act), 15 U.S.C. § 1709(b)(1). The plaintiffs alleged that the Statement of Record and Property Report filed by defendants pursuant to the requirements of the Land Act contained omissions and untrue statements of material facts in violation of 15 U.S.C. §§ 1709(a), (b)(2). The defendants were also alleged to have committed common-law fraud. Subsequently, the plaintiffs filed an Application for Leave to Amend Complaint to allege defendants' violation of the Securities Act of 1933 and the Securities and Exchange Act of 1934 (Securities Acts) and Oklahoma securities laws.

The defendants individually filed motions resisting plaintiffs' certification as a class. Defendants requested dismissal for failure to state a claim upon which relief could be granted, lack of diversity or federal question jurisdiction and failure to join indispensable parties, Heidler Corporation and Timberlake, Inc. Subsequently, the defendants also objected to plaintiffs' attempts to amend their complaint to allege security law violations.

Defendants Larkin Bailey, Paul V. Hartman and Jerald M. Schuman moved that the court enter summary judgment in their favor; the plaintiffs asked the court for summary judgment against those same defendants. The court confronted with the plaintiffs' complaint, plaintiffs' request for class certification and plaintiffs' motion for leave to amend and with defendants' motions to dismiss and with motions for summary judgment as to defendants Bailey, Hartman and Schuman entered an order granting summary judgment for all defendants and dismissing plaintiffs' action.

■■■ The trial court in granting the benefits of summary judgment to the defendants under the Land Act held that the undisputed facts indicated that defendants were neither developers (Timberlake and Heidler corporations) nor selling agents but were simply officers or directors of the corporate developer. In so doing the trial court interpreted 15 U.S.C. § 1701:

(4) "developer" means any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision;

(5) "agent" means any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision; but shall not include any attorney at law whose representation of another person consists solely of rendering legal services;

as limiting liability under the Land Act to the two extremities of most complex land development enterprises. The court noted the absence of a "common control"

* Associate Justice, United States Supreme Court, Retired, sitting by designation.

provision in the Land Act and concluded that Congress intended this Act to have a very limited "target of suit." We conclude that the court erred in imposing such narrow limits to liability under the Act.

As Mr. Chief Justice Burger recently observed, new areas of fraud are being constantly conceived, one of which is fraud "connected with the burgeoning sale of undeveloped real estate, until Congress could examine the problems of the land sales industry and pass into law the Interstate Land Sales Full Disclosure Act." *United States v. Maze*, 414 U.S. 395, 406, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (dictum in dissenting opinion). The general purpose of the Land Act was, of course, to prohibit and punish fraud in such land development enterprises as we here consider and the Act should be interpreted to attain that end. Such an act should be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 285, 11 L.Ed.2d 237. The "developer" of a land sale plan is usually a corporate entity which, in a fraudulent scheme as here alleged, ends up defunct and offers no reserve for recovery to those persons defrauded; so, too, the end selling agent, when the development collapses financially, is often long gone or cannot respond pecuniarily. Indeed the actual selling agent may well be a creditor of the developer and an indirect victim of the fraud himself. The basic protection of the Act, to be meaningful, must be leveled against the fraudulent planners and profit makers for otherwise the Act would be pragmatically barren. No legislative enactment should be rendered ineffective to attain its purpose if such a construction can be avoided. *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 350–51, 64 S.Ct. 120, 88 L.Ed. 88.

The fact that Congress rejected a proposed amendment which would have added a controlling persons clause is not dispositive evidence that the legislature intended to restrict liability to "selling agents." It should be noted that directors and officers are routinely held liable under the Securities Act apart from the controlling person clause. *E. g., Kerbs v. Fall River Industries, Inc.*, 10 Cir., 502 F.2d 731. In any event directors and officers who participate with a corporation or its "selling agents" in fraud in violation of the Land Act are guilty of aiding and abetting. This court has specifically recognized the civil liability of an aider and abettor under the securities antifraud provisions in *Kerbs v. Fall River Industries, Inc.*:

> Under § 10(b) and Rule 10b–5 knowing assistance of or participation in a fraudulent scheme gives rise to liability equal to that of the perpetrators themselves. . . . Moreover, one who aids and abets a fraudulent scheme may be held accountable even though his assistance consists of mere silence or inaction.

502 F.2d 731, 740 (citations omitted).

We hold, therefore, that plaintiffs' alleged cause of action may properly be leveled against the individual defendants in this case be they officers, directors, or participating planners. Such a construction of the Act, although not specifically so stated, seems to have been taken for granted by other courts, for numerous courts have entertained action under the Act leveled at "controlling stockholders, officers and directors." *Adolphus v. Zebelman*, 8 Cir., 486 F.2d 1323, 1325. *See e. g., Kamm v. California City Development Co.*, 9 Cir., 509 F.2d 205, 206; *Siebert v. Great Northern Development Co.*, 5 Cir., 494 F.2d 510; *United States v. Del Rio Springs, Inc.*, D.Ariz., 392 F.Supp. 226; *United States v. Pocono International Corp.*, S.D.N.Y., 378 F.Supp. 1265.

It follows that the trial court's refusal to exercise pendent jurisdiction over the nonfederal cause of action for common-law fraud, while not erroneous in light of that court's disposition of the federal complaint, should now be reconsidered.

■ The trial court rejected plaintiffs' efforts to amend the complaint to allege

a cause of action under the Securities Acts terming the effort to be "wholly without merit." The trial court in so holding noted that real property and land purchase contracts are not securities as defined in 15 U.S.C. § 77b(1). We agree that land, as such, is not a security and that a land purchase contract, simply because the purchaser expects or hopes that the value of the land purchased will increase, does not fall automatically within the confines of the Securities Acts. However, we do not agree that land or its purchase necessarily negates the application of the Securities Acts.

■ The Securities Act of 1933 and the Securities and Exchange Act of 1934 specifically include "investment contracts" within the definition of "security." 15 U.S.C. §§ 77b(1), 78c(a)(10). In *SEC v. W. J. Howey Co.*, the Supreme Court set forth a broad definition of "investment contract":

> The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.

328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244. This definition of an investment contract can include interests in real property. *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88; *Andrews v. Blue*, 10 Cir., 489 F.2d 367, 374–75; *Gilbert v. Nixon*, 10 Cir., 429 F.2d 348, 354. A federal district court has held that a cause of action for fraud under the Securities Acts and the Land Act exists against the promoter of recreational or investment lots. *Tober v. Charnita, Inc.*, M.D.Pa., 58 F.R.D. 74.

■ The characterization of a particular investment as a security within the purview of securities regulation should depend, not upon the form, but upon the substance and economic reality of the transaction in question. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621; *Vincent v. Moench*, 10 Cir., 473 F.2d 430, 435. In following this flexible approach

interests in a real estate venture, fractional interests in oil and gas leases, and even contracts for the purchase and maintenance of live beavers have been held, in particular factual contexts, to be securities. *Andrews v. Blue*, 10 Cir., 489 F.2d 367; *Gilbert v. Nixon*, 10 Cir., 429 F.2d 348; *Continental Marketing Corp. v. SEC*, 10 Cir., 387 F.2d 466, *cert. denied*, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419. In characterizing the purchase of Timberlake lots, the standard set out in *SEC v. C. M. Joiner Leasing Corp.*, must be applied:

> In applying acts of this general purpose, the courts have not been guided by the nature of the assets back of a particular document or offering. The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as [the Securities Act of 1933] it is not inappropriate that promoters' offerings be judged as being what they were represented to be.

320 U.S. 344, 352–53, 64 S.Ct. 120, 124, 88 L.Ed. 88 (footnotes omitted). We also note this court's application of that test in holding the purchase of live beavers and their maintenance to be securities, *Continental Marketing Corp. v. SEC*:

> Investment by members of the public was a profit-making venture in a common enterprise, the success of which was inescapably tied to the efforts of the ranchers and the other defendants and not to the efforts of the investors. "[T]he royal road to riches," of which appellant spoke, could be traveled, if at all, only through the structure which had developed from the embryonic state of the Weaver organization of the early 1950's. . . . If the structure collapsed then the purchasers would have little more than a bad investment. Certainly the beavers as mere animals and not as part of the enterprise did not have value consistent with the price many of the purchasers paid.

The economic inducement was the faith or hope in the success of the enterprise—the domestic beaver industry—as a whole, and not the value of the animals alone.

387 F.2d 466, 470–71, *cert. denied*, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (footnotes omitted).

In light of the trial court's refusal to allow plaintiffs to amend their complaint, it appears appropriate to consider on appeal the evidence as to the security law violations in the light most favorable to plaintiffs. The proposed amendment sought to add an allegation that:

> The lots in the Timberlake Development were represented as, and sold as, investments. The lots were vacant and the Timberlake Development was substantially undeveloped. The vacant lots were of little value unless, by the sole efforts of Heidler and Timberlake, the development obligations of Heidler and Timberlake were fulfilled. Each of the purchasers of a Timberlake lot invested his money in a common scheme which depended solely upon the efforts of Heidler and Timberlake.

The plaintiff offered to prove the following facts:

> The offer and sale of lots in the Timberlake Development was not only the offer and sale of subdivision lots in a real estate development, but the sale of a contractual promise by Heidler Corporation to improve the project, including the construction of a country club, an 18-hole championship golf course, stables, equestrian center, tennis courts, clubhouses and swimming pools.
>
> The lot purchasers had no control over, or participation in the improvement of the project, but entrusted their monies solely to the management of Heidler Corporation. The lots, absent fulfillment of Heidler Corporation's promises to improve them, had little or no value. Substantial purchase prices were paid for the promised improvements. The lots were purchased in expectation that fulfillment of the prom-ise to improve them by Heidler Corporation would result in a substantial increase in the value of the lots.
>
> The lots were sold as, and purchased for, investment.

We note that affidavits of several lot purchasers indicated that they purchased lots as an investment.

The plaintiffs presented evidence which could show that the sale of Timberlake lots constituted more than the mere sale of real estate. During 1970, Heidler, the organizing genius behind Heidler Corporation and Timberlake, had employees and salesmen attend four-week training sessions by Revac in Denver, Colorado. The defendants in this action, Caldwell and Boggess, also attended. The Revac concept was to market and sell real estate to the public as an investment. Many of the officers and directors of Timberlake and Heidler Corporation reviewed or became familiar with those concepts. For example, Schuman reviewed the Revac Group Investing Manual which set forth the Revac concept:

> There can be no doubt in anyone's mind that the main emphasis of RE-VAC is on investment. Most brokers across the country have felt that other real estate brokers have been their main competition. This is not so, however, in the field of investment. The main competition the REVAC Associate has for the investment dollar is Wall Street, the stock broker, mutual fund salesman, and insurance salesmen. If we are to pick up the gauntlets hurled by these investment areas, and face their competition, we are going to have a solid program to present which will enable the public to easily make investments in real estate. We will need to present a more solid and professional front than that offered by the securities or insurance fields, as competition is highly organized.
>
> Because the field of investments has been heretofore considerably neglected by real estate brokers, REVAC has established and field-tested many pro-

grams that will help the Associate obtain a foothold and, indeed, an outstanding reputation in the field of investment. Probably no other endeavor in the field of investment real estate offers so much potential for the client and the broker as does real estate syndication. . . .

There are millions and millions of people in the United States ready, willing, and able to invest small amounts of money. These small amounts of money, once pooled, can become an important factor in the over-all financial field. In order to appeal to these masses, the REVAC Associate should take a very strong look at Group Investing and implement the procedures outlined in this Manual.

In June of 1970, Heidler Corporation, the Tulsa franchise of Revac, held public seminars using the Revac methods, brochures and films to show the advantages of real estate investment. These seminars were advertised to explain real estate investment, "How fortunes are made in real estate," "How to get rich while sleeping," "Why real estate is the one safe, sure, successful investment," etc. Defendants in this case are alleged to have participated in advertising these seminars and lectured at them. The seminars were allegedly used not only to sell real estate through limited partnerships but also to promote the sale of Timberlake lots. Persons attending seminars signed their names and addresses, these were later given to Timberlake lot salesmen.

The General Form For Registration of Securities (Form 10) filed by Heidler Corporation with the S.E.C. states that "Timberlake, Inc., is selling lots to individuals for investment purposes and ultimately for individuals to construct a home and retire, all in a scenic and recreation area." The written instructions to Timberlake salesmen contain passages such as the following:

INVESTMENT PRIVILEGES. Homesite owners will also be given first opportunities for investment on a joint venture or limited partnership basis for all commercial enterprises at Timberlake. This includes commercial parcels, restaurants, service stations and shopping centers, as they are planned and become available.

RAW, UNDEVELOPED LAND. Some potential clients will say, "But we can buy 40 acres of land near here for the price of a lot at Timberlake" . . . What security will they have on that 40 acres? Will they hire a private policeman to keep out looters when they aren't home, or will they never leave? What about their insurance rates? What about streets, water, swimming pool, golf, country club?

We, the management of the Heidler Corporation have provided you with the finest investment/ownership package in the nation to sell.

That some Timberlake lot purchasers intended to invest their money rather than reside on the lots is evidenced by the fact that in 1971 on the 262 Timberlake Agreements for Deed, 108 purchasers indicated they did not expect to reside on their lots. The Timberlake brochures, provided prospective purchasers, discussed or presented duplicated items covering such topics as "the secret in speculating in raw land," capital gain and real estate and "fortunes, large and small are being made in land." The brochures touted Timberlake as a "prime investment in a natural setting," an "outstanding investment opportunity" and possessed with recreational assets "to aid your investment [to] grow in value each day." Purchasers received letters from Heidler Corporation complimenting them on their "wise investment" and encouraging them to participate in "many opportunities for future investments." Purchasers also received invitations to "investment seminars" which were advertised to be possibly the "most productive hour" of their lives.

We note that without the substantial improvements pledged by Heidler Corporation and Timberlake the lots would not have a value consistent with the price which purchasers paid. *See Continental Marketing Corp. v. SEC*, 10 Cir., 387 F.2d 466, 470–71, *cert. denied* 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419. The utilization of purchase money accumulated from lot sales to build the promised improvements brings the scheme within the "common enterprise" definition. We also note that in applying the second test of the *Howey* case, "reliance of the investor solely upon the efforts of the promoter," it has been widely held that this reliance of the investor on the promoter need not be total. The Ninth Circuit in *SEC v. Glenn W. Turner Enterprises, Inc.*, held the test to be:

> [W]hether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.

474 F.2d 476, 482, *cert. denied* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53. The Ninth Circuit reaffirmed this standard in *Bitter v. Hoby's International, Inc.*, 498 F.2d 183; other circuits have utilized this same standard. *SEC v. Koscot Interplanetary, Inc.*, 5 Cir., 497 F.2d 473, 477–78; *Lino v. City Investing Co.*, 3 Cir., 487 F.2d 689, 692–93. It may be, in the instant case, that an investor who purchased a Timberlake lot, not to build thereon but to hold solely as an investment, could be relying upon the managerial efforts of Heidler Corporation and Timberlake for the management and appreciation of his investment. That other lot purchasers may be interested solely in obtaining a site on which to build their home merely indicates the duality of this "investment/ownership package."

Considering the evidence procedurally presented, the defendants' claim does not appear frivolous or wholly lacking in merit. Weighing this evidence in the light most favorable to defendants in conjunction with the definitions and applications of "investment contract" in *C.*

*M. Joiner Leasing Corp.* and *Continental Marketing Corp.*, we hold there is a factual question as to whether the sale of Timberlake lots constitutes sales of securities. The amendment to allege security law violations must be allowed.

By way of cross-appeal, the defendants urge that the trial court erred in indicating that this action could preliminarily be treated as a class action under Rule 23. Since this question does not reach us in isolation, we hold that there is nothing in this record which indicates that the trial court abused its discretion in such regard. However, we in no way foreclose the trial court's continuing exercise of discretion on this issue.

Other contentions made by the parties are deemed to be without merit or mooted by our decision.

The case is remanded for further proceedings.