Robert V. PLISKIN et al., Plaintiffs,

v.

Ralph BRUNO, et al., Defendants.

Steven R. VALLEE, et al., Plaintiffs,

v.

Ralph BRUNO, et al., Defendants.

Jacqueline GOLDMAN, et al., Plaintiffs,

v.

Mark KEARNS, et al., Defendants.

Civ. Nos. 90–0005–P–C, 90–0038–P–C and 90–0004–P–C.

United States District Court,
D. Maine.

Dec. 1, 1993.

659

Jeffrey Rosenblatt, William D. Robitzek, Berman & Simmons, P.A., Lewiston, ME, for plaintiffs.

Peter Haroutian, pro se.

Richard P. Romeo, Smith & Elliott, Portland, ME, for Ralph Bruno.

Jerrol A. Crouter, Benjamin E. Marcus, Drummond, Woodsum, Plimpton & MacMahon, Portland, ME, for Port Resort Realty, Inc.

John M.R. Paterson, Gregory A. Tselikis, Kate S. Debevoise, Bernstein, Shur, Sawyer, & Nelson, Portland, ME, for Granite State Nat. Bank, First N.H. Mortg. Corp.

Mark A. Kearns, pro se.

William C. Knowles, Verrill & Dana, Portland, ME, for James D. Waterman.

*MEMORANDUM OF DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT*

GENE CARTER, Chief Judge.

These three civil actions stem from the offer and sale of units at two real estate condominium projects in Kennebunkport,

Maine between July 1987 and April 1988. The cases will be referred to as *Pliskin, Vallee,* and *Goldman.* Plaintiffs in *Pliskin* and *Vallee* purchased condominium units at the Shawmut Inn, and Plaintiffs in *Goldman* purchased units at the Inn at Goose Rocks. The purchases at both projects were made from Defendant developers James Waterman[1] and Mark Kearns. Waterman's and Kearns' acquisition and development of these projects, as well as the purchase of units by several Plaintiffs, were financed with loans from subsidiaries of First New Hampshire Banks, Inc.[2] of which Defendant First New Hampshire Bank ("First NH") is the successor corporation.[3] The gravamen of Plaintiffs' Complaints is that Defendants, in the manner in which they offered and sold these condominium units and in events subsequent to Plaintiffs' purchases of these units, violated federal and state securities laws as well as breached contractual agreements and fiduciary duties, and that they were negligent. *See* First Amended Complaint, *Goldman* (Docket No. 2), and Third Amended Complaint, *Vallee* (Docket No. 121a).

These actions originally involved twenty-six Plaintiffs, but through settlement of claims, action of the Court, and attrition, there now remain only five Plaintiffs including Jacqueline and Albert Goldman in the *Goldman* case, and Lorraine Kavanaugh[4] and Richard and Evelyn Robbins in the *Vallee* case.[5] First NH now moves for Partial Summary Judgment against the above-named Plaintiffs, except Lorraine Kavanaugh, on all counts involving securities law violations, contending that the transactions in which Plaintiffs purchased their condominium units at Shawmut and Goose Rocks do not, as a matter of law, constitute the sale of "securities" under the federal and state acts. Motion by Defendant First NH for Partial Summary Judgment, *Goldman* (Docket No. 87), and *Pliskin* (Docket No. 171). Defendant Kearns has joined First NH's Motion. Response by Defendant Kearns, *Goldman* (Docket No. 103), and *Pliskin* (Docket No. 201).

The immediate legal predicate for this Motion for Partial Summary Judgment is this Court's decision, after trial, in a relat-

1. These actions were stayed in May 1991 as to Defendant Waterman following his filing for bankruptcy relief under Chapter 7. *See* Letter from Defendant James Waterman, *Pliskin* (Docket No. 140). Proceedings appear from this Court's file to still be stayed with respect to that Defendant.

2. First N.H. Mortgage Corporation provided the financing for the purchase and development of the real estate projects and First N.H. Banks Granite State financed many of the individual condominium purchases, including those of the remaining Plaintiffs in the *Vallee* case. Jacqueline and Albert Goldman, who remain as Plaintiffs in the *Goldman* case, received financing for their unit purchase from another bank not affiliated with First NH Banks. *See* Defendant First NH Bank's Statement of Material Facts, *Goldman* (Docket No. 88) at 8.

3. First NH Mortgage Corporation and First NH Banks Granite State were previously subsidiaries of First NH Banks, Inc. and were originally named as Defendants in these actions. Defendant First NH Bank, the successor corporation, has now taken the place of the above-named Defendants in this litigation. Plaintiffs also named Ralph Bruno and Port Resort Realty as Defendants in the *Pliskin* and *Vallee* cases. Bruno acquired the Shawmut Inn from Kearns and Waterman through his company, Port Resort Realty, and purportedly assumed all of the obli-

gations and liabilities of Kearns and Waterman. Proceedings were stayed against Bruno and Port Resort on May 28, 1991, after Port Resort filed for bankruptcy under Chapter 11. *See* Motion of Port Resort and Order on Motion, *Pliskin* (Docket Nos. 117 and 137). Port Resort has since been dismissed from the action, Motion to Dismiss and Endorsement (Docket Nos. 195 and 195–1), because its obligations to Plaintiffs were satisfied pursuant to the terms of the Amended Joint Plan of Reorganization confirmed by the U.S. Bankruptcy Court. A final Defendant, Atlantic Title Company, was dismissed in the *Pliskin* and *Vallee* cases on May 22, 1991. Motion to Dismiss Claims of Atlantic Title Company, *Pliskin* (Docket No. 131).

4. While Lorraine Kavanaugh remains as a Plaintiff in the *Vallee* case, she did not sue Kearns, Waterman or First NH, so her claims are not involved in the pending motion. *See* Third Amended Complaint, *Vallee* (Docket No. 121a).

5. While all Plaintiffs have apparently settled in the *Pliskin* case, the Court will still refer to that case name in identifying many docket references because *Pliskin* and *Vallee* were consolidated for discovery purposes in September of 1990. *See* Plaintiffs' Motion to Consolidate, *Vallee* (Docket No. 33). Beginning in February of 1991, docket entries were discontinued in *Vallee* and entered solely on the *Pliskin* docket.

ed action involving the offer and sale of condominium units at the Bellevue Inn, another Kearns–Waterman project located near Wells Beach in Maine. *Lavery v. Kearns,* 792 F.Supp. 847 (D.Me.1992).[6] In *Lavery,* this Court found that the transactions at issue were not securities; hence, plaintiffs could not rely on the protections of federal and state securities laws to obtain relief for what were, in essence, contract claims. As Plaintiffs in the current actions have been unable to point to any genuine issues of material fact to distinguish their transactions from those presented in *Lavery,* the Court finds that, as a matter of law, the offer and sale of condominiums at Goose Rocks and Shawmut do not constitute securities. Hence, Defendants' Motion for Partial Summary Judgment will be granted, resolving in Defendants' favor all counts in Plaintiffs' Complaint that allege federal and state securities law violations.[7]

Under Federal Rule of Civil Procedure 56(c), summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Court of Appeals for the First Circuit has recently stated:

> [T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 [106 S.Ct. 2548, 2553, 91 L.Ed.2d 265] (1986). When that is accom-

plished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson,* 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511.

---

**6.** The *Lavery* decision became final when plaintiffs withdrew their appeal to the Court of Appeals for the First Circuit on November 30, 1992.

**7.** The counts at issue in this Motion for Partial Summary Judgment are Counts I, II, III, V, VI, VII, and VIII, First Amended Complaint, *Goldman* (Docket No. 2), and Third Amended Complaint, *Vallee* (Docket No. 121a). Count I alleges that all Defendants violated sections 77e, 77j, 77*l*, 77*o*, and 77q of the Securities Act of 1933 by failing to register the sale of condominium units as securities and to provide potential purchasers with financial and other information required under the Act and by providing materially misleading information to purchasers of securities, 15 U.S.C. §§ 77e, 77j, 77*l*, 77*o*, and 77q. Count II alleges that all Defendants violated sections

78j and 78t and corresponding regulations of the Securities and Exchange Act of 1934 by withholding material information and otherwise perpetrating fraud in the sale of the condominium units, 15 U.S.C. §§ 78j and 78t and 17 C.F.R. § 240.10b–5. Count III alleges that First NH Bank violated the above provisions by aiding and abetting the conduct of Kearns, Waterman, Bruno and Port Resort. Counts V, VI and VII allege that all Defendants violated the Maine, New Hampshire, and Massachusetts analogs of the federal securities laws, 32 M.R.S.A. § 10101 *et seq,* N.H.Rev.Stat.Ann. § 421–B:1 *et seq,* and Mass.Gen.Laws Ann. ch. 110A, respectively. Count VIII alleges that First NH violated the above-mentioned state securities laws by aiding and abetting the conduct of the other Defendants.

*Brennan v. Hendrigan,* 888 F.2d 189, 191–92 (1st Cir.1989). The undisputed facts which are relevant to the Court's assessment of Defendants' Summary Judgment Motion are set forth below.

## I. UNDISPUTED FACTS

### A. Purchase and Marketing of Units at the Shawmut Inn and the Inn at Goose Rocks

Defendants Waterman and Kearns obtained financing for the purchase of the Shawmut Inn ("Shawmut") in the winter of 1986 from subsidiaries of First NH Banks, Inc. In 1987 and 1988, after the purchase of the Shawmut was completed, they began to market and sell twenty hotel-condo units located in the Chalet building of the Inn. The Inn was located on the ocean in Kennebunkport and included several other buildings, housing a restaurant, lounge, and conference facilities. Kearns and Waterman planned to replace most of the buildings on the property to create a 205–room "world class" resort. *See* Deposition of James Waterman, Nov. 14, 1990 ("Waterman Deposition"), Exhibit 1, *Vallee.* Their development plans included tearing down the Chalet. Under the terms of their agreement, investors who purchased condo units in the Chalet could select a "buyback" option under which Defendants promised to repurchase their units at a fixed price before the building was destroyed or they could trade in their units for ones in the newly constructed buildings along with paying for any difference in price. *See* Waterman Deposition, Exhibit 2 (explaining the buyback option) and Contract for the Purchase and Sale of Real Estate, Exhibit B, *Vallee* (Docket No. 1). *Vallee* Plaintiffs Richard and Evelyn Robbins purchased a condo unit at the Shawmut.

In December of 1987, one year after purchasing the Shawmut, Kearns and Waterman obtained additional financing from First NH Banks, Inc. for the purchase of the Inn at Goose Rocks ("Goose Rocks"). Located about a half mile from the beach in Kennebunkport, Goose Rocks included a restaurant and 32 condominium units which Defendants began marketing shortly after the purchase. Purchasers at Goose Rocks signed buyback agreements that are similar to the agreements signed by Shawmut investors. Because plans for the resort did not include any major construction, however, unit owners at Goose Rocks could opt out of the buyback option and keep their original units. Contract for the Purchase and Sale of Real Estate, Exhibit B, *Goldman* (Docket No. 1). *Goldman* Plaintiffs Jacqueline and Albert Goldman purchased a unit at Goose Rocks.

In soliciting purchasers at both developments, Defendants' marketing approach emphasized the coastal location of the projects, the opportunity that the condo units presented for owning real estate at the beach, and the possible appreciation in value that comes with owning real estate:

> This concept of the hotel-condo, with a focus on coastal location for a reasonable price and general market appreciation, has always been my sales message to potential buyers of such units.

Waterman's and Kearns' Affidavits, *Vallee* (Docket Nos. 78–9) at ¶ IV.

### B. Lease/Buyback Option

It is undisputed that Plaintiffs purchased their units at Goose Rocks and the Shawmut for investment, not residential, purposes. Defendant First NH Bank's Statement of Material Facts, *Goldman* (Docket No. 88), and *Pliskin* (Docket No. 172) at 13. In negotiating the purchases, Defendants presented various options to investors for managing their units. Of primary importance was the lease/buyback option because all Plaintiffs remaining in these cases were parties to such agreements.

#### 1. Lease agreements

The lease agreements provided that unit owners would lease their units to Atlantic Hospitality, Inc., a company owned by Kearns and Waterman, which assumed all managerial responsibility. Unit owners, in turn, would receive monthly rental payments *in a fixed amount* calculated to cover their monthly mortgage payments, condominium fees, and real estate taxes. Waterman Deposition, Exhibit 2. The rental payment *was guaranteed* under the terms of the agree-

ment regardless of whether Atlantic Hospitality was able to rent out the unit. *See* Lease Agreements, Exhibit A, *Vallee* (Docket No. 1), and *Goldman* (Docket No. 1) at 8. The only difference between the agreements signed by Plaintiffs in *Goldman* and *Vallee* was that leases for unit owners at Goose Rocks would run for a five-year period while leases at Shawmut would run for a two-year period, to end when the construction was scheduled to be completed and the Chalet, with its existing condo units, was slated to be torn down. *See* Waterman Deposition, Exhibit 2.

### 2. Buyback agreements

The buyback agreement provided that Waterman and Kearns would purchase units back from owners within a two-year period at Shawmut and within a five-year period at Goose Rocks. The buyback purchase price *was set at a fixed amount* calculated to equal the original purchase price paid by the unit owner plus "a 20% annual return on the 20% downpayment of your original purchase." *Id.,* Option I at ¶ 3. *See also* Contract for the Purchase and Sale of Real Estate, Exhibit B, *Vallee* (Docket No. 1), and *Goldman* (Docket No. 1). Both the lease and buyback agreements included clauses that gave unit owners the option to cancel the agreements upon thirty days notice. But as Plaintiffs note, cancelling the buyback agreement for Shawmut purchasers would not have enabled them to hold on to their existing units because the Chalet building was to be torn down. Instead, purchasers would have to trade in their units for units in the newly constructed buildings *and would have to pay for any difference in the fixed buyback price of their old units and the market value of the*

new units. *See* Waterman Deposition, Exhibit 2.

Purchasers who declined to elect the lease/buyback option were presented with a separate option of signing a management agreement whereby unit owners would split rental proceeds 60/40 with a Kearns/Waterman rental company. Only two Plaintiffs in the original actions chose this latter option; with one of those Plaintiff's claims having been dismissed and the other having reached a settlement with Defendants.[8]

### C. Financial Collapse of Defendants' Operations

By the summer and fall of 1988, the real estate market in Southern Maine had fallen into serious decline. In November of 1988, Waterman and Kearns announced they could no longer pay operating expenses at the projects or adhere to other contractual obligations with unit purchasers. *See* Memorandum of Law in Support of Motion of First NH Bank for Partial Summary Judgment ("First NH Memorandum"), *Goldman* (Docket No. 89), and *Pliskin* (Docket No. 173) at 4. *See also* Jacqueline Goldman Affidavit, Exhibit A, *Goldman* (Docket No. 59). A little over one year later, in January and February of 1990, Plaintiffs filed these actions.

The parties' statements of material facts, filed pursuant to Local Rule 19(b), include additional information with respect to the financial dealings between Kearns, Waterman, and First NH; the interrelation of the financing of the development projects; the financial condition of Kearns' and Waterman's operations; and First NH's financing of unit purchases. These additional facts are not pertinent to the issues before the

---

8. Plaintiffs Peter Haroutian and LCM Associates, who were initially parties to the *Vallee* case, signed agreements to split rental income with Kearns and Waterman. Haroutian's claims were dismissed pursuant to a Motion by First N.H. as a sanction for failing to attend the final pretrial conference in *Pliskin/Vallee* and for otherwise failing to prosecute his action. First NH Bank's Motion to Dismiss Claims of Peter Haroutian, *Pliskin* (Docket No. 192). Plaintiff LCM Associates, through its attorney, has informed the Court that LCM has settled its claims with Defendants.

Plaintiffs filed opposition papers to First NH's Motion for Partial Summary Judgment prior to

the settlement and dismissal of Haroutian's and LCM's claims. In opposing Defendants' Motion, Plaintiffs argued, in part, that Haroutian's and LCM's rental-sharing agreements would likely constitute securities under federal and state laws. Because these Plaintiffs are no longer parties to these actions, the Court need not consider the facts surrounding their transactions with Defendants or the arguments raised in support of their claims. The remaining Plaintiffs would not, in any event, benefit from any determination made in favor of Haroutian and LCM because the circumstances of their transactions do not implicate any rental-sharing elements.

Court—namely, whether the offer and sale of these condo units can be classified as "securities"—and hence will not be detailed here.

## II. REQUIREMENTS FOR CHARACTERIZING OFFER AND SALE OF CONDO UNITS AS "SECURITIES"

■ Defendant First NH's Motion for Partial Summary Judgment focuses this Court's attention on one issue:

> whether the transactions in which Plaintiffs purchased their Shawmut Inn and Inn at Goose Rocks units with the optional leaseback and buyback agreements were investment contracts and constituted the sale of securities, so as to render First NH Bank potentially liable for the violation of federal and state securities laws.

First NH Memorandum at 6. In assessing the nature of the transactions at issue, this Court will look to its most recent pronouncement of the law governing securities as set out in *Lavery*.[9] As detailed in that case, a "security" is defined as including an "investment contract" under federal securities laws as well as the state securities laws in question. *Lavery*, 792 F.Supp. at 851 & 860. In *S.E.C. v. W.J. Howey Co.*, the Supreme Court has defined an investment contract to include:

> [A]ny contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third person.

*Howey*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). Under *Howey*, Plaintiffs must show (1) an investment; (2) in a common enterprise; (3) with profits generated solely from the efforts of a third party. Plaintiffs clearly satisfy the first prong of the *Howey* definition because it is undisputed that the purchase of condo units was an investment. Satisfying the second part of

*Howey* is more problematic. The standards which courts have applied in assessing whether parties have invested in a "common enterprise" are summarized below.

### A. "Common Enterprise"

■ As pointed out in *Lavery*, neither the Court of Appeals for the First Circuit nor the United States Supreme Court have clarified what elements to look for in finding a "common enterprise" under *Howey*. District courts in the First Circuit and elsewhere have applied both a narrow vertical commonality and a horizontal commonality analysis for determining whether various transactions satisfy the definition of an investment contract. Narrow vertical commonality "finds a common enterprise when the investment manager's fortunes rise and fall with those of the investor." *Lavery*, 792 F.Supp. at 851 (quoting *Savino v. E.F. Hutton & Co.*, 507 F.Supp. 1225, 1237 (S.D.N.Y. 1981)). Horizontal commonality, on the other hand, focuses on whether the assets from two or more investors are pooled into a single fund, usually accompanied by a *pro rata* sharing of profits from the joint enterprise. *Hocking v. Dubois*, 839 F.2d 560, 566 (9th Cir.1988), *approved en banc*, 885 F.2d 1449, 1459 (9th Cir.1989).

This Court found that it need not decide which approach to follow in *Lavery* because the lease/buyback agreements, executed upon the purchase of condo units at the Bellevue, failed to satisfy either test. With respect to vertical commonality, this Court emphasized the fact that investors were guaranteed rental and buyback payments that were fixed in amount regardless of the developers' profits or managerial expertise. Thus, *Lavery* plaintiffs were sheltered from the vagaries of the market such that their fortunes did not rise and fall with the for-

---

**9.** Plaintiffs argue that the necessary prerequisites for issue preclusion or collateral estoppel have not been satisfied to justify using the *Lavery* decision to bar Plaintiffs from raising claims of securities law violations in the current actions. *See* Plaintiffs' Objection to First NH Bank's Motion for Partial Summary Judgment and Incorporated Memorandum of Law in *Pliskin* (Docket No. 175) and *Goldman* (Docket No. 91). The *Lavery* deci-

sion, however, in no way precludes Plaintiffs' securities law allegations but merely clarifies, on a precedential basis, the rules of law that this Court will apply in assessing whether Plaintiffs here point to a sufficient set of facts, established in the record of the present cases, that would allow them to prove at trial that the transactions in question constitute securities.

tunes of the developers. *Lavery*, 792 F.Supp. at 853.

As for horizontal commonality, the *Lavery* Court found that there was no traditional pooling of investor interests and no *pro rata* sharing of profits and losses. See *Howey*, 328 U.S. at 295–97, 299–300, 66 S.Ct. at 1101–02, 1103 (where each investor bought a strip of land in an orange grove; all the oranges were pooled and sold; and investors received a share in the profits or absorbed losses equal to their share in land). In contrast, the lease and buyback agreements in *Lavery* cordoned off investors from the sharing of losses or profits amongst themselves and placed the risk on the developers. The fact that Kearns and Waterman may have ultimately pooled receipts from the sales and rental of units was not relevant to a finding of horizontal commonality, because the method in which Defendants ran their operations "was not part of an initial *development* plan that included Plaintiffs and the other purchasers." *Lavery*, 792 F.Supp. at 858. As the Court stated, the determinative factor was that:

> [e]ach owner had his own unit, with its separate contracts with Kearns and Waterman, and each owner could make profits or sustain losses independent of the fortunes of the other purchasers.

*Id.* If Kearns and Waterman failed to adhere to their obligations, then each owner would have a remedy for contractual breach.

## B. Application of Lavery Principles to the Facts of the Goldman and Vallee Cases

First NH argues that the lease/buyback agreements in the current actions do not differ in any material respect from the agreements found not to constitute securities in *Lavery*. First NH Memorandum, *Goldman* (Docket No. 89), and *Pliskin* (Docket No. 173) at 9–10. They point out that the lease and buyback agreements in these actions are virtually indistinguishable from those at issue in *Lavery*[10], and that the guaranteed payments preclude a finding that investors' fortunes were intertwined with that of Defendants or that their investments were pooled for a *pro rata* sharing in profits or losses. They argue that Plaintiffs are unable to identify any genuine issues of material fact to distinguish the present transactions from those at issue in *Lavery* and conclude that the precedent established in *Lavery* compels this Court to grant their Motion for Partial Summary Judgment on the securities claims. *Id.* at 11.

Plaintiffs counter that genuine issues of material fact distinguish the current actions from *Lavery*, and they urge the Court to "look beyond the four corners of the written documents in determining the existence of an investment contract...." Plaintiffs' Objection to First NH Bank's Motion for Partial Summary Judgment and Incorporated Memorandum of Law ("Plaintiffs' Memorandum"), *Goldman* (Docket No. 91), and *Pliskin* (Docket No. 175) at 3 (quoting *Rodriguez v. Banco Central*, 777 F.Supp. 1043, 1059 (D.P.R.1991), *aff'd*, 990 F.2d 7 (1st Cir.1993)). Plaintiffs argue primarily that they invested in Defendants' larger development plans and that the buyback option at the Shawmut differed significantly from the buyback option considered by this Court in *Lavery*.[11]

---

**10.** One of the only differences between the agreements are that the amounts of the lease and buyback payments at the Shawmut and Goose Rocks are much higher, reflecting the more prestigious locations of these projects at Kennebunkport, where then-President Bush spent his vacation time. The lease agreements in *Goldman* and *Vallee* guaranteed monthly payments of $718.73 to Plaintiffs at Goose Rocks, which was located a half mile from the beach, and $1,194.83 to Plaintiffs at the Shawmut, which was located on the ocean. Exhibit A (Docket No. 1) in *Goldman* and *Vallee*. The buyback agreements guaranteed Goose Rocks Plaintiffs $104,703.00 for their units on or before April 8, 1993 and Shawmut Plaintiffs $163,200.00 for their units on or before

February 9, 1990. Exhibit B (Docket No. 1) in *Goldman* and *Vallee*.

**11.** Plaintiffs also raise another factual issue that involves Defendants' alleged promise to market quarter shares at the Inn at Goose Rocks by emphasizing the interrelationship of that project with future improvements at the Shawmut. Plaintiffs' Supplemental Memorandum, *Goldman* (Docket No. 102), and *Pliskin* (Docket No. 200) at 8. (Quarter sharing involves dividing a condominium into four equal fee simple estates which are then sold separately). Plaintiffs offer no facts to indicate whether the promised marketing of quarter shares was significant to their decisions to invest in the Goose Rocks units. Nor do Plaintiffs give any explanation of why the prom-

The Court will consider Plaintiffs' arguments in turn.

### III. The Offer and Sale of Condo Units at the Shawmut Inn and the Inn at Goose Rocks

#### A. Investment in Overall Development Plans at the Shawmut

Plaintiffs in *Vallee/Pliskin* argue that investors did not simply purchase individual condominium units but invested in Defendants' overall plans to renovate the Shawmut Inn. While no significant development was underway at Goose Rocks, *Goldman* Plaintiffs argue that they, too, invested in development at the Shawmut because Defendants planned to provide shuttle buses between the two resorts such that renters at Goose Rocks could enjoy the restaurant and other facilities at the Shawmut located only a half mile away. Plaintiffs state, "[t]he value of the units at the Shawmut and the Inn at Goose Rocks was inherently bound up in the developers' and Banks' plan for reconstructing the Shawmut Inn." Plaintiffs' Supplemental Memorandum in Opposition to Defendant First NH Banks' Motion for Partial Summary Judgment ("Plaintiffs' Supplemental Memorandum"), *Goldman* (Docket No. 102), and *Pliskin* (Docket No. 200) at 8. By asserting that Plaintiffs risked their investments in a larger venture controlled by Defendants, Plaintiffs attempt to characterize the transactions as a "common enterprise." [12]

It is undisputed that Kearns and Waterman were planning to undertake major renovations at the Shawmut at the same time as they began marketing units at the Chalet and at the Inn at Goose Rocks. This factor, as Plaintiffs argue, may cast a different light

on the transactions in question. In a recent case, the Court of Appeals for the First Circuit stated:

> A security *might* exist if the defendants had promised, along with the land sales, to develop the community themselves. Then each buyer might be acquiring an interest not only in land but in a package of commitments that, taken together, could comprise a business venture harnessing the entrepreneurship of the promoter ... The promoter's commitment to build the community, in turn, could constitute the 'common enterprise' financed jointly by the buyers.

*Rodriguez v. Banco Central Corporation*, 990 F.2d 7, 11 (1st Cir.1993) (citation omitted) (holding that the offer and sale of undeveloped lots in swamp land does not constitute securities where sellers did not represent to purchasers that they would directly undertake development of the area and where most purchasers bought the land for residential, not investment, purposes).

In *Rodriguez*, the Court of Appeals referred favorably to several cases that have taken this view including *McCown v. Heidler*, 527 F.2d 204 (10th Cir.1975). In *McCown*, the Court of Appeals for the Tenth Circuit held that summary disposition was not appropriate where the facts asserted by Plaintiffs might allow them to prove at trial "the sale of a contractual promise by [the developer] to improve the project, including the construction of a country club, an 18–hole championship golf course, stables, equestrian center, tennis courts, clubhouse and swimming pools." *McCown*, 527 F.2d at 209. The *McCown* court also noted that "without the substantial improvements pledged by [the

---

ised marketing of quarter shares could transform the transactions in question into securities. In addition, they fail to controvert Defendants' Statement of Material Facts which minimizes the role played by the quarter-share concept, indicating that Kearns and Waterman considered the idea but decided against it when the Bank declined to provide financing to potential quarter-share buyers. Defendant First NH's Statement of Material Facts, *Goldman* (Docket No. 88), and *Pliskin* (Docket No. 172), ¶ 13 at 7. Because there is no factual support for this alleged distinction, the Court dismisses it without further discussion.

12. In *Lavery*, this Court rejected such an argument because renovations at the Bellevue project were virtually complete and promises to finish a health club or minor room renovations were not found to be "the crux of the prospective value of Plaintiffs' investment." *Lavery*, 792 F.Supp. at 859. In addition, the fact that Defendants discussed development plans at the Shawmut with Bellevue investors as well as the use of all three projects—Shawmut, Bellevue, and Goose Rocks—to attract and cater to renters was too attenuated to convince the Court that Plaintiffs at the Bellevue "were jointly buying into that development in any significant sense." *Id.*

developer] the lots would not have a value consistent with the price which purchasers paid." *Id.* at 211 (citing *Continental Marketing Corp. v. SEC,* 387 F.2d 466, 470–71 (10th Cir.1967), *cert. denied,* 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968).

Plaintiffs point to these cases to support their assertions, but they fail to provide any affidavits or other factual evidence indicating that Defendants' plans to develop the Shawmut played a role in Plaintiffs' decision to invest in the project. They simply state in briefs that "development of the Shawmut Inn ... played a far greater role in the purchase of the units" and that the value of the condo units at Goose Rocks and the Shawmut "was inherently bound up in the developer's ... plans for reconstructing the Shawmut." *See* Plaintiffs' Memorandum at 4 and Plaintiffs' Supplemental Memorandum at 8. Such "[f]actual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment." *Nieves v. University of Puerto Rico,* 7 F.3d 270, 276 n. 9 (1st Cir.1993) (citing *Fragoso v. Lopez,* 991 F.2d 878, 887 (1st Cir.1993), and *Transurface Carriers, Inc. v. Ford Motor Co.,* 738 F.2d 42, 46 (1st Cir.1984)).

■ The simple fact that Defendants were planning to undertake major development is not enough, standing alone, to support a finding that investment in condo units at the projects constitute securities.[13] Instead, Plaintiffs must point to facts detailing the manner in which the transactions were presented "by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *SEC v. C.M. Joiner Leasing Corp,* 320 U.S. 344, 352–53, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943). These additional facts must provide Plaintiffs with an evidentiary basis allowing them to prove

that Defendants *represented their future development plans* in a manner calculated to induce investment in the projects and, in essence, sold to Plaintiffs *a contractual promise* to carry through with their development plans to augment the value of their investments. *McCown,* 527 F.2d at 208–09. *See also Aldrich v. McCulloch Properties,* 627 F.2d 1036, 1039 (10th Cir.1980) (holding that complaint, which states that defendants encouraged purchases by promising investors that their lots would increase in value because of defendants' development activities, sufficiently alleges the existence of an investment contract for the purposes of maintaining an action under federal securities laws). As the Court of Appeals for the First Circuit stated in *Rodriguez,* "[a] security *might* exist if the defendants *had promised* ... to develop the community themselves." *Rodriguez,* 990 F.2d at 11 (emphasis added).

Plaintiffs fail to point to facts indicating that Defendants made any such promise. Instead, the evidence before the Court strongly indicates that guarantees provided in the lease/buyback agreements, which tended to fully insulate the investor from any economic risk resulting from the purchase of units, not promises of future development, were at the core of the parties' bargain. Plaintiffs' Complaints make no mention of development plans but describe the transactions in the following terms:

> [Defendants] ... represented and promoted [Goose Rocks/the Shawmut Inn] condominiums to Plaintiffs as being an investment opportunity whereby Plaintiffs would purchase condominiums ... then immediately lease the condominiums back to Atlantic Hospitality, Inc. (an entity owned and controlled by Kearns and Waterman) ... and would also then execute an agree-

---

**13.** In *Woodward v. Terracor,* 574 F.2d 1023 (10th Cir.1978), decided just a few years' after *McCown,* the Court of Appeals for the Tenth Circuit did not find a common enterprise where plaintiffs purchased lots from a developer who planned to build shopping centers, health and cultural facilities, transportation facilities, and recreational areas. As the Court stated:
[Defendant] was involved in a business venture. [Defendant] was developing a new resi-

dential community. As part of its venture [defendant] sold lots to persons who either intended to build houses thereon, or intended to resell to others who would so build. But *the mere fact that plaintiffs bought lots* from [defendant] *does not mean that* by such acquisition *they were* thereafter *engaged in a common venture* or enterprise....
*Id.* at 1025 (emphasis added).

ment to in the future sell the condominiums back to Kearns and Waterman.... First Amended Complaint, *Goldman* (Docket No. 2) at ¶ 11, and Third Amended Complaint, *Vallee* (Docket No. 121a) at ¶ 10.

There is evidence in the record indicating that Defendants sent a letter to potential investors describing their plans to create a "world class" resort on the property and inviting investors to purchase units at the Chalet "as an opportunity to buy at the 'ground floor' in an exciting and unique project." Waterman Deposition, Exhibit 1. Those who responded to this mailing were given additional materials that detailed the lease/buyback options at the Shawmut. *Id.,* Exhibit 2. Plaintiffs, themselves, assert that Kearns and Waterman *used these latter materials* that discussed the two management options "as the basis for the sales pitch" at all scheduled meetings with potential purchasers. Plaintiffs' Objection to Defendant's Statement of Material Facts ("Plaintiffs' Objection"), *Goldman* (Docket No. 92), and *Pliskin* (Docket No. 176) at 4–5. An affidavit in the record submitted by Plaintiff Richard Robbins further supports this assertion. Affidavit of Richard Robbins, *Vallee* (Docket No. 63). Robbins states that he decided to purchase a unit at the Shawmut based on conversations that he had with Defendant Kearns. Robbins describes these conversations as involving Kearns' descriptions of the lease/buyback agreements with no mention of any future development plans. As the affidavit indicates:

> With assurances from Kearns that *this was a no lose, all win investment opportunity,* I purchased a unit at the Shawmut Inn ... I would not have purchased the unit without the Rental and Buy Back Agreements. I considered the two Agreements to be part of one investment package.

Affidavit of Richard Robbins at ¶¶ 4–5 (emphasis added). In summary, Plaintiffs' allegations in the Complaints, their statement of material facts, and other evidence in the record highlight the centrality of the very elements of these transactions that were found in *Lavery* to bar a conclusion that the purchases constituted securities.

Further, Plaintiffs fail to object to Defendants' characterization of their marketing of units at the Shawmut and Goose Rocks in which future development plans played no role. Kearns and Waterman describe their strategy for attracting investors as focusing on the coastal location of the projects, the reasonable price of the hotel-condo units, and appreciation in value of the individual units from general market appreciation. Waterman's and Kearns' Affidavits, *Vallee* (Docket Nos. 78–9) at ¶ IV, as referred to in Defendant First NH Bank's Statement of Material Facts, *Goldman* (Docket No. 88), and *Pliskin* (Docket No. 172) at 3–4. Defendants' use of future development plans to induce investment is wholly absent from this description. Pursuant to Local Rule 19(b)(2), the Court deems this assessment to be admitted because Plaintiffs have failed to controvert it. Hence, while Plaintiffs claim that they were investing in Defendants' larger development plans, the record before the Court provides no basis for a fact finder to conclude anything other than that such plans were of incidental concern in these transactions. The only conclusion possible on the record made is that the parties focused almost exclusively on the guarantees against risk provided by the lease/buyback agreements.

### B. Buyback Agreements at the Shawmut Inn

The *Vallee* Plaintiffs also argue that the nature of the buyback agreements at the Shawmut differed in a material respect from the buybacks in *Lavery* when viewed in the context of Defendants' overall development plans at the Shawmut. Plaintiffs point out that Defendants planned to tear down existing condo units at the Chalet by the time they exercised the buyback option. Plaintiffs' Objection, *Goldman* (Docket No. 92), and *Pliskin* (Docket No. 176) at 5. If *Vallee* Plaintiffs opted out of the buyback, they could not keep their original units, but would have had to trade them in for units at newly renovated buildings while paying any price differential between them.

Construing these facts most favorably to Plaintiffs *might* support a finding of vertical commonality because investors at the Chalet

were dependent upon the success of Defendants' future development plans to create valuable units in the new buildings in order to make opting out of the buyback plan a valid option. But Plaintiffs give no indication that they paid more than market value for their Chalet units and they were not guaranteed an even exchange for the units in the new development when the changeover would take place. These facts militate against a finding that they invested in Defendants' speculative venture in a manner satisfying the requirements of vertical commonality. Even though the nature of the buybacks differed, Plaintiffs' fortunes were still not interwoven with Defendants' financial success. If the development was successful and Defendants' profits went up, Plaintiffs would have to pay the differential in price between their Chalet units and the new units. If the development was unsuccessful and Defendants' losses mounted, Plaintiffs could still exercise the buyback option at a guaranteed price.

This Court is unable to determine any other manner in which the differences in the buyback option would support a finding that the transactions of *Vallee* Plaintiffs constituted a security. Plaintiffs give the Court no direction in this matter. Plaintiffs state merely that:

> the necessity of having control over the Chalet building when the time came to tear it down *might cause* the Court to construe Kearns' and Waterman's rights under the buyback contracts differently with respect to the Shawmut Plaintiffs.

Plaintiffs' Memorandum at 4 (emphasis added). The possibility that tearing down the Chalet building "might cause" this Court to construe Defendants' rights differently is not sufficient for withstanding this Motion for Partial Summary Judgment in which First NH has argued that no genuine issues of material fact distinguish the transactions in *Goldman* and *Vallee* from the transactions in *Lavery.* Once the movant has pointed to "an absence of evidence to support the nonmoving party's case," *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554, the burden shifts to Plaintiffs, who "must adduce specific, provable facts demonstrating that there is a triable issue":

> 'The *evidence* illustrating the factual controversy *cannot be conjectural or problematic;* it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.'

*Brennan v. Hendrigan,* 888 F.2d at 191–92 (emphasis added) (quoting from *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d at 181). Given this burden, Plaintiffs have failed to prove that distinctions between the buyback agreements in *Vallee/Pliskin* raise a genuine issue of material fact that should be decided at trial. Plaintiffs in *Goldman* and *Vallee/Pliskin* have been unable to point to any genuine issues of material facts to distinguish these lease/buyback agreements from the agreements at issue in *Lavery.* Based on the legal analysis in *Lavery,* the recent *Rodriguez* decision issued by the Court of Appeals for the First Circuit, and a host of other cases dealing with the definition of investment contracts under the securities laws, this Court finds that as a matter of law, the transactions in the current actions, with the optional lease and buyback agreements, do not constitute the sale of securities under federal or state law.

Accordingly, it is *ORDERED* that Defendants' Motion for Partial Summary Judgment on Counts I, II, III, V, VI, VII, and VIII in *Goldman* and *Vallee/Pliskin,* which base liability on the violation of federal and state securities laws, be, and it is hereby, *GRANTED.*

So *ORDERED.*